## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THE CITY OF WATERBURY, THE CITY OF BRIDGEPORT, THE BOROUGH OF NAUGATUCK, THE TOWN OF SOUTHBURY, THE TOWN OF WOODBURY, THE TOWN OF FAIRFIELD, THE TOWN OF BEACON FALLS, THE CITY OF MILFORD, THE TOWN OF OXFORD, THE CITY OF WEST HAVEN, THE TOWN OF NORTH HAVEN, THE TOWN OF THOMASTON, THE CITY OF TORRINGTON, THE CITY OF BRISTOL, THE TOWN OF EAST HARTFORD, THE TOWN OF SOUTHINGTON, THE TOWN OF NEWTOWN, THE CITY OF SHELTON, THE TOWN OF TOLLAND, THE TOWN OF STRATFORD, THE TOWN OF BERLIN, THE TOWN OF MIDDLEBURY, THE TOWN OF PROSPECT, THE TOWN OF SEYMOUR, THE TOWN OF WOLCOTT, THE TOWN OF BETHLEHEM, THE TOWN OF NEW MILFORD, THE TOWN OF ROXBURY, AND THE TOWN OF COVENTRY,

Plaintiffs,

v.

WALGREENS BOOTS ALLIANCE, INC., WALMART INC., CVS HEALTH CORPORATION; AND RITE AID CORPORATION,

Defendants.

CIVIL ACTION NO.:

**COMPLAINT AND JURY DEMAND**

## TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................. 1

II.    JURISDICTION AND VENUE............................................................................ 7

III.   PLAINTIFFS......................................................................................................... 8

IV.    DEFENDANTS ..................................................................................................... 9

V.     FACTS ................................................................................................................. 10

    A.   Opioids and Addiction ............................................................................. 10

    B.   Defendants' Duties Under the Common Law and the Controlled
       Substances Act ......................................................................................... 14

       1.   Defendants' Common Law Duties.............................................. 14

       2.   Defendants' Duties Under the Federal Controlled Substances Act ........ 14

          (a)   Duties of Distributors under the CSA ........................................... 15

          (b)   Duties of Dispensers under the CSA ............................................. 16

    C.   Defendants Were Aware of Their Duties under the CSA ..................................... 19

    D.   Defendants Failed to Comply with Their Duties and Failed to Provide
       Effective Controls Against Diversion........................................................ 28

       1.   Defendants Were Uniquely Positioned to Prevent Diversion and
          Had in Their Possession Data that Would Have Permitted Them to
          Identify Suspicious Orders and-Red-Flag Prescriptions, But Failed
          to Make Use of this Information............................................................. 29

       2.   Walgreens  Failed to Maintain Effective Controls against
          Diversion.................................................................................... 35

       3.   Walmart Failed to Provide Effective Controls against Diversion ........... 62

       4.   CVS Failed to Provide Effective Controls against Diversion................. 76

       5.   Rite Aid Failed to Provide Effective Controls against Diversion............ 88

       6.   Multiple Enforcement Actions against Defendants Confirm Their
          Compliance Failures ................................................................. 104

    E.   Opioids Defendants Sold Migrated into Plaintiffs' Communities from
       Other Jurisdictions ................................................................................. 116

    F.   Defendants Were on Notice of and Contributed to Illegal Diversion of
       Prescription Opioids................................................................................ 117

    G.   Defendants Conspired to Engage in the Wrongful Conduct Complained of
       Herein and Intended to Benefit Both Independently and Jointly from Their
       Conspiracy. ............................................................................................. 118

      H.     Defendants Have Created and Maintained a Public Health Crisis in Connecticut and Plaintiffs' Communities .......................................................... 120

      I.      Defendants' Conduct Created an Abatable Public Nuisance ............................ 123

**VI.     CLAIMS FOR RELIEF ............................................................................................ 123**

**VII.   PRAYER FOR RELIEF ......................................................................................... 125**

## I.     INTRODUCTION

1.      This case arises from the worst man-made epidemic in modern medical history—an epidemic of addiction, overdose, and death caused by Defendants flooding the United States, including the State of Connecticut and Plaintiffs' communities, with prescription opioids.

2.      Plaintiffs The City of Waterbury, The City of Bridgeport, The Borough of Naugatuck, The Town of Southbury, The Town of Woodbury, The Town of Fairfield, The Town of Beacon Falls, The City of Milford, The Town of Oxford, The City of West Haven, The Town of North Haven, The Town of Thomaston, The City of Torrington, The City of Bristol, The Town of East Hartford, The Town of Southington, The Town of Newtown, The City of Shelton, The Town of Tolland, The Town of Stratford, The Town of Berlin, The Town of Middlebury, The Town of Prospect, The Town of Seymour, The Town of Wolcott, The Town of Bethlehem, The Town of New Milford, The Town of Roxbury, and The Town of Coventry, are political subdivisions of the State of Connecticut ("Plaintiffs").

3.      Defendants Walgreens Boots Alliance, Inc. ("Walgreens"), Walmart Inc. ("Walmart"), CVS Health Corporation ("CVS"), and Rite Aid Corporation ("RiteAid") ("Defendants") are wholesale distributors and retail dispensers of opioids.

4.      As distributors and dispensers of dangerous narcotic drugs, Defendants have a common law duty to exercise reasonable care in the distribution and dispensing of those drugs. Under federal and State law, they have a duty to maintain effective controls against diversion of those drugs from the legitimate stream of commerce into the illicit marketplace.

5.      Defendants breached their duties and failed to monitor and restrict the improper distribution and dispensing of opioids. As a result, they oversupplied opioids into Plaintiffs' communities and thereby substantially contributed to the creation and maintenance of a public nuisance.

1

6.     Since the late 1990s, the death toll from opioid overdoses has steadily climbed, as shown in the following chart:



Figure 3. National Drug Overdose Deaths Involving Any Opioid, Number Among All Ages, by Gender, 1999-2019

*Among deaths with drug overdose as the underlying cause, the any opioid subcategory was determined by the following ICD-10 multiple cause-of-death codes: natural and semi-synthetic opioids (T40.2), methadone (T40.3), other synthetic opioids (other than methadone) (T40.4), or heroin (T40.1).  Source: Centers for Disease Control and Prevention, National Center for Health Statistics. Multiple Cause of Death 1999-2019 on CDC WONDER Online Database, released 12/2020.

7.     From 1999 through 2016, more than 350,000 people died from an overdose involving opioids.  Well over half of those deaths involved prescription opioids, such as oxycodone and hydrocodone.

8.     Most of the overdoses from non-prescription opioids are also directly related to prescription opioids. Many prescription opioid users, having become addicted to prescription opioids but no longer able to obtain them, have turned to heroin, fentanyl, and other illicit drugs. Approximately 75% of people who suffer an opioid overdose began their opioid use with prescription opioids.

2

9.      The wrongful conduct of Defendants caused the nation, including Connecticut and Plaintiffs' communities, to be awash in a flood of prescription opioids, which contributed to an epidemic of addiction that has had severe and wide-ranging effects on public health and safety throughout the nation, including Connecticut and Plaintiffs' communities. Indeed, from those suffering with the disease of addiction themselves, to children whose parents who suffer from addiction, to employers who employ an addicted population, to the first responders, law enforcement, the court system and the prison system, there is almost no area of the community that has not been significantly impacted.

10.     According to data from the Automation of Reports and Consolidated Orders System ("ARCOS") of the Drug Enforcement Administration ("DEA"), from 2006 through 2014, there were 882,333,879 oxycodone and hydrocodone pills supplied to Connecticut—enough for 246 pills for every adult and child in the State—which had a population of 3,574,097 according to the 2010 United States Census Bureau. Defendants were responsible for at least 527,101,730 of those pills.

11.     According to the Connecticut Department of Public Health, from 2012 to 2021, the use of illicit drugs and misuse of prescription opioids were the main causes of drug overdose deaths in Connecticut, resulting in a total of 9,219 deaths. There was a gradual, but significant, increase in the number of deaths from 2012 (357) to 2021 (524), as illustrated by this chart:



12.     The majority of these overdose deaths are linked to overdose of prescription opioid

painkillers and illicit opioids.

13.     According to the CDC, the 2020 Connecticut age-adjusted rate for drug-induced

mortality was 39.1 per 100,000 population—higher than the 2020 national rate of 28.3.

14.     Overdose deaths are not the only consequence of the opioid crisis.  Each year,

hundreds of people are treated in Connecticut emergency rooms for drug overdoses, as illustrated

in the following chart:





15.     The damage inflicted by the opioid crisis cuts across ages and generations.  Many who have succumbed to overdoses have overdosed more than once.  Those who survive are often not alone at the time.  Family members, including young children, have watched their loved ones lose consciousness or die.  Young children, including toddlers, also have been the direct victims of overdoses themselves after coming into contact with opiates. Children are being displaced from their homes and raised by relatives or placed in the Plaintiffs' care due to parents' addiction and death.  Babies are born addicted to opioids due to prenatal exposure.

16.     Defendants, the last link in the opioid supply chain and the critical gatekeeper between dangerous opioid narcotics and the public, contributed to the creation of the opioid crisis because they failed in their gatekeeper role, flouted their duties to protect the public, violated the laws designed to protect the public and disregarded measures designed to protect the public health

5

and safety and thereby opened the floodgates to an oversupply of opioids that significantly exceeded legitimate medical demand.

17.     Defendants failed to design and operate systems to identify suspicious orders of prescription opioids, failed to maintain effective controls against diversion, failed to halt suspicious orders when they were identified, and failed to make use of information they had to prevent the dispensing of illegitimate prescriptions. Instead, they actively contributed to the oversupply of such drugs and fueled an illegal secondary market.

18.     Defendants have contributed substantially to the opioid crisis by helping to inflate the opioid market beyond any legitimate bounds and by flooding that market with quantities of prescription opioids that they knew were far greater than those needed to satisfy legitimate medical demand, while also failing to report or to take steps to halt suspicious orders and sales, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

19.     As a direct and foreseeable result of Defendants' wrongful conduct, cities and counties across the nation, including Plaintiffs, are now swept up in what the Centers for Disease Control ("CDC") has called a "public health epidemic" and what the U.S. Surgeon General has deemed an "urgent health crisis."

20.     The increased volume of opioid dispensing, not all of which is for legitimate use, correlates directly to skyrocketing addiction, overdose and death; black markets for diverted prescriptions opioids; and a concomitant rise in heroin and fentanyl abuse by individuals who became addicted to prescription opioids but who could no longer legally acquire or could not afford prescription opioids.

21.     Defendants' wrongful conduct has had severe and far-reaching public health, social services, and criminal justice consequences, including the fueling of addiction and overdose

from illicit drugs such as heroin. This has created a public nuisance in Plaintiff's communities, substantially interfering with public health, public safety, public peace, public comfort, or the public convenience. Having created, contributed to, maintained, or contributed to the maintenance of this public nuisance, Defendants are responsible for abating it.

22.     The opioid crisis has also imposed costs on Plaintiffs and other governmental entities. These necessary and costly responses to the opioid crisis include the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarceration, treating opioid-addicted newborns in neonatal intensive care units, burying the dead, and placing children in foster care placements, among others. These burdens are not the normal or typical burdens of government programs and services. Rather, these are extraordinary costs and losses that are related directly to Defendants' illegal actions.

23.     In this action, Plaintiffs, in their capacity as governmental entities, seek an order requiring Defendants to fund the costs of abating the opioid epidemic, and further, on their own behalf, seek damages to compensate them for the extraordinary burdens of the opioid crisis.

## II.     JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

25.     This Court has personal jurisdiction over Defendants because they carry on a continuous and systematic part of their general business within Connecticut, have transacted substantial business with Connecticut entities and residents, and have caused harm in Connecticut as a result of the specific business activities complained of herein.

26.     This Court has personal jurisdiction over all Defendants because the causes of action alleged in this Complain arise out of each Defendants' transacting business in Connecticut, contracting to supply services or goods in this state, causing tortious injury by an act or omission in this state, and because the Defendants regularly do or solicit business or engage in a persistent course of conduct or deriving substantial revenue from goods used or consumed or services rendered in this state. Defendants have purposefully directed their actions towards Connecticut and/or have the requisite minimum contacts with Connecticut to satisfy any statutory or constitutional requirements for personal jurisdiction.

27.     This Court has personal jurisdiction over all Defendants because the causes of action alleged in this Complain arise out of the distribution of goods by the Defendants with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed.

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in the District of Connecticut.

### III.     PLAINTIFFS

29.     Each Plaintiff is municipality organized and exiting under the laws of the state of Connecticut.

30.     Plaintiffs have a responsibility and duty to protect the public health, safety, and welfare of their residents and employees.

31.     Plaintiffs provide a wide range of services and programs to its residents, including public health and human services, emergency care, an emergency call center, drug and alcohol services and programs, programs for children, youth, and families, public assistance, law enforcement, and jails.

## IV.    DEFENDANTS

32.    Defendant Walgreens Boots Alliance, Inc. ("Walgreens") is a Delaware corporation with its principal place of business in Illinois.

33.    Walgreens, directly and through its subsidiaries and affiliated entities and agents, conducts business as wholesale distributor and also operates retail stores, including in and around Plaintiff's communities, which sell prescription medicines, including opioids.

34.    Defendant Walmart Inc. ("Walmart") is a Delaware corporation with its principal place of business in Arkansas.

35.    Walmart, directly and through its subsidiaries and affiliated entities and agents, conducts business as wholesale distributor and also operates retail stores, including in and around Plaintiff's communities, which sell prescription medicines, including opioids.

36.    Defendant CVS Health Corporation ("CVS") is a Delaware corporation with its principal place of business in Rhode Island.

37.    CVS, directly and through its subsidiaries and affiliated entities and agents, conducts business as wholesale distributor and also operates retail stores, including in and around Plaintiff's communities, which sell prescription medicines, including opioids.

38.    Defendant Rite Aid Corporation ("RAC") is a Delaware corporation with its principal place of business in Pennsylvania.

39.    Rite Aid, directly and through its subsidiaries and affiliated entities and agents, conducts business as wholesale distributor and also operates retail stores, including in and around Plaintiff's communities, which sell prescription medicines, including opioids.

9

## V.      FACTS

### A.      Opioids and Addiction

40.      The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids. Natural opioids are derived from the opium poppy. Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

41.      Opioid addiction is explained by a change in an opioid user's brain chemistry. Opioids bind to mu-pain receptors temporarily relieving pain. In addition, opioids cause the release of dopamine. Dopamine is a naturally occurring neurotransmitter that causes feelings of pleasure and reward.

42.      In response to repeated additional releases of dopamine from opioid use, the brain begins to downregulate the amount of dopamine it naturally produces, a process known as neuroadaptation. The result is a dopamine deficient state, in which the brain is producing less dopamine and the user is experiencing less pleasure and more pain than they were before opioid use began.

43.      In a dopamine deficient state, a user needs opioids to return to their previous dopamine baseline and to avoid the pain of prolonged dopamine deficiency. Users need opioids not to feel good but just to restore a level balance and feel normal. Opioid users in this state are physically dependent on the drugs. Someone taking opioids for relatively short periods of time can develop physical dependence and experience withdrawal if they stop taking opioids. Symptoms of withdrawal include anxiety, debility, insomnia, dysphoria, and in the case of opioids, a very distinct and painful physical withdrawal syndrome, including full-body pain that can be experienced and is typically experienced in people who do not have a pain disorder.

44.     Over time, opioid users generally require higher doses to experience the same effect that they initially experienced. This is the process of developing tolerance to the drug. The brain adapts to the presence of the opioid molecule such that the individual needs more and more to get the same effect and ultimately is physically dependent and experiences painful withdrawal when they stop whether or not they have a pain condition.

45.     Once the brain adapts to the presence of opioids, it can take a very long time after the individual has stopped using their drug for the brain to reset itself to normal dopamine levels. Reducing opioid use requires tapering, which involves gradually progressing to lower doses of opioids. The process of tapering off opioids is time-intensive and requires substantial support from clinicians and other providers in the healthcare system.

46.     Opioid addiction affects people from all walks of life, regardless of age, ethnicity, or socioeconomic status. The neural pathways affected by opioid use are common across all people, which makes everyone vulnerable to opioid addiction.

47.     Opioids carry risks of addiction even when prescribed by a medical professional. Stronger dosages and longer durations of use increase the risk of addiction.

48.     Opioid addiction can have devastating consequences. People suffering from the most severe forms of addiction commit all available resources to obtaining more of the substance, even forgoing natural rewards like food, finding a mate, or raising children. For people suffering from severe addiction, consuming more opioids often appears to be the only way to avoid the intense pain of withdrawal.

49.     The significant increase in opioid prescribing that took place in the late 1990s throughout the 2000s resulted from changing views on the safety and efficacy of opioids as a form of pain treatment. For much of the twentieth century, medical professionals used opioids sparingly

11

because of the legitimate concern that patients would get addicted. Opioid use was generally limited to treating cancer pain, hospice patients, and for short-term use in treating pain stemming from severe injuries. Medical professionals understood that opioids carried high risks of abuse, and they limited their prescribing. This "conservative consensus" about opioid prescribing held for decades until it began to change in the 1990s.

50.     In the 1990s and throughout the 2000s, opioid manufacturers launched aggressive marketing campaigns intended to persuade medical professionals that prescription opioids were a safe and effective form of treatment for many pain conditions. The marketing campaigns aimed to expand the market for prescription opioids from a limited range of acute conditions to commonplace forms of pain, such as lower back pain and headaches.

51.     The most important risk factor for opioid addiction is access to opioids. The massive increase in opioid prescriptions caused corresponding increases in opioid abuse, addiction, and overdoses.

52.     By the early 2000s, prescription opioids had surpassed heroin as the leading cause of opioid overdoses. From 2000 to 2010, prescription opioids caused the overwhelming majority of opioid overdose deaths.

53.     In the early 2010s, the medical community's view on prescription opioids began to change again. Rates of opioid abuse, addiction, and overdoses had increased across the country for a decade. There was a growing spotlight on recreational use of prescription opioids, including abuse by teenagers and adolescents. In addition, there was growing awareness that the medical profession and government regulators had underappreciated opioids' risks of addiction. Medical professionals began to recognize that the overreliance on opioids to treat pain had caused a crisis

nationally. Doctors began to take a more careful approach to opioid prescribing and opioid prescribing rates began to decline.

54.     As prescription opioids became less readily available, many people addicted to prescription opioids began to turn to heroin. In that way, the massive increase in prescription opioids in the 2000s helped to increase the demand for heroin in the 2010s.

55.     The link between prescription opioid use and heroin use is well established. The most significant risk factor for heroin use is exposure to prescription opioids. Multiple studies have found that approximately 70–80% of heroin users in the last two decades used prescription opioids before using heroin. Approximately 75% of people who suffer an opioid overdose began their opioid use with prescription opioids.

56.     People who stop using prescription opioids have an increased risk of transitioning to heroin. From 2002 to 2013, heroin use increased 138% among those who use prescription opioids. Like opioid abuse, heroin use affects people from all walks of life. In recent years, heroin use has increased across race, gender, and social class.

57.     Fentanyl is cheap to produce, and it is extremely potent. In the mid-2010s, drug traffickers responded to increasing demand for opioids by increasing the production and distribution of black-market fentanyl. Fentanyl emerged on the East Coast around 2013. The lower cost and higher potency of fentanyl resulted in increased demand for the drug, especially as the supply of prescription opioids decreased. Demand for fentanyl is a function of the opioid abuse that resulted from the significantly increased supplies of prescription opioids throughout the 2000s. Prescription opioids laid the groundwork for the current wave of fentanyl abuse. People began to seek out fentanyl to maintain their opioid dependence or use disorder.

**B.      Defendants' Duties Under the Common Law and the Controlled Substances Act**

      **1.      Defendants' Common Law Duties**

58.      Under the common law, Defendants had a duty to exercise reasonable care in the distribution and dispensing of dangerous narcotic substances. By flooding Connecticut, and the Plaintiffs' communities, with more opioids than could be used for legitimate medical purposes, by filling and failing to report orders that they knew or should have known were likely being diverted for illicit uses, and by failing to maintain effective controls against diversion from their retail stores, Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm.

      **2.      Defendants' Duties Under the Federal Controlled Substances Act**

59.      In addition to, and consistent with, their common law duties of care, Defendants are required to register with the DEA to distribute and/or dispense controlled substances under the CSA. *See* 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100; 28 C.F.R. § 1301.71.

60.      The CSA and its implementing regulations govern the manufacture, distribution, and dispensing of controlled substances. The CSA categorizes controlled substances into five schedules based on a drug's risk profile and accepted medical uses. Schedule I drugs may not be prescribed because they have high potential for abuse and no currently accepted medical use. Schedule II drugs are the most dangerous drugs that may be dispensed: they have a high potential for abuse—including risks of psychological or physical dependence—but they also have accepted medical use. Schedule III and IV drugs have moderate to low potential for abuse. Most prescription opioids are Schedule II drugs, but a minority are Schedule III or IV drugs.

61.      The CSA and its implementing regulations determine what persons and entities are authorized to make, distribute, prescribe, and dispense controlled substances. Every person or entity that manufactures, distributes, prescribes, or dispenses controlled substances must apply for

14

registration with the DEA. *See* 21 U.S.C. § 822(a)(1)–(2). The DEA "shall register an applicant" unless it determines "that the issuance of such registration is inconsistent with the public interest." *Id*. § 823(b). Manufacturers and distributors must renew their DEA registrations every year, and pharmacies and prescribers must renew their registration every three years. *See id.* § 822(1)–(2).

62.     Requiring entities to register with the DEA creates a "closed system of distribution" for controlled substances. Under the closed system, each person or entity in the controlled substance supply chain is a DEA registrant, controlling the market for controlled substances from manufacture to dispensing. DEA-registered manufacturers sell to DEA-registered distributors that sell to DEA-registered dispensers. DEA-registered dispensers may only dispense controlled substance prescriptions pursuant to prescriptions written by DEA-registered prescribers. The closed system of distribution aims to secure the controlled substance supply chain against diversion.

63.     Diversion happens when controlled substances are taken from "the legitimate stream of commerce and moved into the illicit marketplace." Every registrant under the CSA is required to "maintain effective controls against diversion" of controlled substances. *See* 21 C.F.R. § 1301.74 (a)

64.     Although all registrants under the CSA are required to maintain effective controls against diversion, distribution and dispensing activities are subject to somewhat different specific regulatory requirements. As both distributors and dispensers of controlled substances, Defendants were required to comply with both sets of duties.

### (a)     Duties of Distributors under the CSA

65.     Under the CSA and its implementing regulations, distributors of controlled substances are required to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b).. The CSA's implementing regulations

define a "suspicious order" to include "a controlled substance order that is of unusual size, unusual frequency or substantially deviating from the normal ordering pattern." Determining whether an order is suspicious is a context-based inquiry that requires consideration of the totality of the circumstances.

66.     No regulation defines the specific aspects of the system that distributors must use to monitor and report suspicious orders. Rather, it is the responsibility of the registrant to determine what type of suspicious order monitoring system is correct for their business model or how they are doing business. The main determinant of an effective suspicious order monitoring system is that it effectively identifies and reports suspicious orders.

67.     In addition to identifying and reporting suspicious orders, distributors of controlled systems are required to halt shipment of orders so identified.  Suspicious orders may not be shipped unless and until the distributor is able to determine, through due diligence, that the order is not likely to be diverted. Although not originally spelled out in the CSA, this duty follows from the duty to maintain effective controls against diversion, as it is axiomatic that controls cannot be effective if distributors may ship, without further investigation, orders they know show indicia of possible diversion.  The duty not to ship suspicious orders has been recognized by the DEA as well as by multiple federal courts, and has been codified by Congress

### (b)     *Duties of Dispensers under the CSA*

68.     Dispensers of controlled substances are also subject regulations under the CSA. Like all registrants, they must maintain effective controls against diversion. In addition, the CSA requires that controlled substances be dispensed only pursuant a valid prescription written by a medical professional acting in the ordinary course of professional practice.   21.C.F.R. § 1306.04(a).

69.     A prescription that is not for the purpose of treating a patient's medical condition is an illegitimate prescription. *See* 21 C.F.R. § 1306.04(a). Two sources of illegitimate prescriptions are unscrupulous prescribers and drug-seeking patients. Unscrupulous prescribers—often referred to as "pill mills"—write medically unnecessary prescriptions for patients, often in exchange for cash payment. Drug-seeking patients also deceive prescribers into writing unnecessary prescriptions in a variety of ways, including by faking symptoms and visiting multiple prescribers to obtain multiple prescriptions for the same condition. Illegitimate prescriptions are not used to treat a medical condition—they are generally abused by the recipient or sold illegally. When an illegitimate prescription is filled, the drugs are diverted because they are not being obtained for a legitimate medical use.

70.     Under the CSA's implementing regulations, pharmacists have a "corresponding responsibility" to determine whether a prescription for a controlled substance is written for a legitimate medical purpose before dispensing it. 21.C.F.R. § 1306.04(a) ("The responsibility for the proper prescribing and dispensing is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.") (emphasis added). While the corresponding responsibility requires pharmacists to perform due diligence on controlled substance prescriptions, pharmacies also have a duty to ensure that the corresponding responsibility is being fulfilled. Pharmacies are DEA registrants and are subject to CSA regulations. Pharmacists are the agents of a pharmacy, and the pharmacy is responsible for their conduct. In this regulatory framework, pharmacies act as the "last line of defense" for guarding against diversion by providing their pharmacists with the training and resources needed to ensure that pharmacists only dispense legitimate prescriptions for controlled substances.

71.     Signs that a prescription may be illegitimate are commonly referred to a "red flags." Red flags are "warning signs" indicating that further inquiry is required. These red-flags include (a) multiple prescriptions to the same patient using the same doctor; (b) multiple prescriptions by the same patient using different doctors; (c) prescriptions of unusual size and frequency for the same patient; (d) orders from out-of-state patients or prescribers; (e) an unusual or disproportionate number of prescriptions paid for in cash; (f) prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; and (g) volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose.

72.     Any red flags present on the face of a prescription must be resolved before the prescription is dispensed. If a pharmacist cannot resolve a red flag, the prescription cannot be dispensed. A red flag does not mean that a prescription is illegitimate. Red flags are signs that a prescription might be illegitimate, but a pharmacist can sometimes resolve a red flag through due diligence. Generally speaking, the due diligence process involves four steps: identify any red flags, obtain information relevant to resolving the red flags, evaluate the information, and document the reasons supporting filling or refusing to fill the prescription.

73.     Due diligence efforts must be thorough: the investigation must dispel all red flags indicative that a customer is engaged in diversion to render the order non-suspicious and exempt it from the requirement that the distributor or dispenser inform the DEA. Put another way, if, even after investigating the order, there is any remaining basis to suspect that a customer is engaged in diversion, the order must be deemed suspicious and the DEA must be informed.

74.     The CSA also imposes important record-keeping obligations on pharmacies, including pharmacy chains. "[E]very registrant . . . dispensing a controlled substance or substances

18

shall maintain, on a current basis, a complete and accurate record of each such substance . . . received, sold, delivered, or otherwise disposed of by him." 21 USC 827(a). "[A] registrant's accurate and diligent adherence to [its recordkeeping] obligations is absolutely essential to protect against the diversion of controlled substances." Paul H. Volkman, 73 FR 30,630, 30,644 (2008). An important component of an anti-diversion system is the documentation Defendants possess. They must utilize their information to identify patterns of diversion and for auditing, training, and investigation of suspicious activity in an effort to prevent diversion of controlled substances.

75.      According to law and industry standards, if a pharmacy finds evidence of prescription diversion, the Board of Pharmacy and DEA must be contacted.

76.      State and federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent distributors and pharmacies should not fall. Together, these laws and industry guidelines make clear that Defendants possess and are expected to possess, specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription opioids and of the risks and dangers of the diversion of prescription opioids when the supply chain is not properly controlled.

77.      Further, these laws and industry guidelines make clear that Defendants have a responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market.

**C.      Defendants Were Aware of Their Duties under the CSA**

78.      Defendants were well aware of their duties under the CSA. The DEA repeatedly reminded them of these duties. Moreover, Defendants themselves, and trade organizations to which they belonged recognized the duties created by the CSA.

19

79.     In 2006 and 2007, Joe Rannazzisi, the Deputy Assistant Administrator of the DEA's Office of Diversion Control, sent letters to every entity registered with the DEA to distribute controlled substances, including Walgreens. The letters reiterated that every entity registered to distribute controlled substances has a duty under the CSA to identify and report suspicious orders, and the letters provided further guidance on identification and reporting requirements. Rannazzisi testified that he sent the letters in part because he was concerned that distributors were not maintaining systems to identify suspicious orders and were not reporting suspicious orders. He was also concerned about the growing problem of prescription opioid abuse in the United States.

80.     Rannazzisi sent the first letter in September 2006. It emphasizes that the abuse of controlled prescription drugs is a serious and growing health problem in this country. The letter reiterates distributors' statutory responsibility to exercise due diligence to avoid filing suspicious orders that might be diverted for illegitimate use, provides a non-exclusive overview of circumstances that may indicate suspicious orders from a pharmacy customer, and states that distributors have a statutory duty to timely report suspicious orders to the DEA.

81.     Rannazzisi sent another letter in December 2007. It focuses on the importance of reporting suspicious orders to the DEA and resolving any indicia of suspicion before shipping the order. The letter makes clear that sending a monthly report of completed orders to the DEA is not sufficient. It specifically states that filing a monthly report of completed transactions does not meet the statutory requirement to report suspicious orders. In addition, the letter states that registrants must conduct an independent analysis of suspicious orders before filling them. The letter further states that suspicious order monitoring systems that rely on "rigid formulas" to identify suspicious orders are insufficient. Determining whether an order is suspicious depends not only on the

ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the relevant segment of the regulated industry. The letter concludes that filling orders without first determining that order is not being diverted may be failing to maintain effective controls against diversion.

82.     The DEA has also repeatedly affirmed the obligations of pharmacies to maintain effective controls against diversion in regulatory action after regulatory action.[1] The DEA, among others, also has provided extensive guidance to pharmacies on how to identify suspicious orders and other evidence of diversion.

83.     DEA has repeatedly emphasized that retail pharmacies, such as Defendants, are required to implement systems that detect and prevent diversion and must monitor for and report red flags of diversion.  When red flags appear, the pharmacy's "corresponding responsibility" under 21 C.F.R. § 1306.04(a) requires it either to take steps (and document those steps) to resolve the issues or else to refuse to fill prescriptions with unresolvable red flags.[2] DEA has identified several types of "unresolvable red flags" which, when present in prescriptions presented to a pharmacist, may never be filled by the overseeing pharmacist.  These unresolvable red flags include: a prescription issued by a practitioner lacking valid licensure or registration to prescribe the controlled substances; multiple prescriptions presented by the same practitioner to patients from the same address; prescribing the same controlled substances in each presented prescription;

---

[1] See, e.g., Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195; 77 Fed. Reg. 62,316 (DEA Oct. 12, 2012) (decision and order); East Main Street Pharmacy, 75 Fed. Reg. 66,149 (DEAOct. 27, 2010) (affirmance of suspension order); Holiday CVS, L.L.C. v. Holder, 839 F.Supp.2d 145 (D.D.C. 2012); Townwood Pharmacy; 63 Fed. Reg. 8,477 (DEA Feb. 19, 1998) (revocation of registration); Grider Drug 1 & Grider Drug 2; 77 Fed. Reg. 44,069 (DEA July 26, 2012) (decision and order); The Medicine Dropper; 76 Fed. Reg. 20,039 (DEA April 11, 2011) (revocation of registration); Medicine Shoppe-Jonesborough; 73 Fed. Reg. 363 (DEA Jan. 2, 2008) (revocation of registration).
[2] Pharmacy Doctors Enterprises, Inc. v. Drug Enf't Admin., No. 18-11168, 2019 WL 4565481, at *5 (11th Cir. Sept. 20, 2019).

a high volume of patients presenting prescriptions and paying with cash; and, a prescription presented to by a customer who has traveled significant and unreasonable distances from their home to see a doctor and/or to fill the prescription at the pharmacy.

84.     DEA guidance also instructs pharmacies to monitor for red flags that include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances as compared to other practitioners in the area, and (2) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time. Most of the time, these attributes are not difficult to detect and should be easily recognizable by Defendants' diversion control systems.

85.     The DEA has also explained these red flags in individual meetings with Defendants. For example, in December 2010, DEA hosted a meeting with CVS's representatives and counsel and advised CVS of the "red flags . . . that a pharmacy should be familiar with in order to carry out its corresponding responsibility to ensure that the controlled substances are dispensed for a legitimate medical purpose."[3]

86.     Examples of red flags that the DEA identified during its meeting with CVS include:

- many customers receiving the same combination of prescriptions (*i.e.*, oxycodone and alprazolam);

- many customers receiving the same strength of controlled substances (*i.e.*, 30 milligrams of oxycodone with 15 milligrams of oxycodone and 2 milligrams of alprazolam);

- many customers paying cash for their prescriptions;

_____

[3] Declaration of Joe Rannazzisi in Holiday CVS, L.L.C. v. Holder, 839 F. Supp.2d 145 (D.D.C. 2012).

- many customers with the same diagnosis codes written on their prescriptions (*i.e.*, back pain, lower lumbar, neck pain, or knee pain); and

- individuals driving long distances to visit physicians and/or to fill prescriptions.[4]

87.     Similarly, in 2011, the DEA took Walgreens "to the woodshed" over its dispensing cocktail drugs and opioids to questionable out of state customers, customers with the duplicate diagnoses, young people, and customers only paying cash.  Many of these same red flags were highlighted in the 2009 Walgreens Order to Show Cause and resulting 2011 Memorandum of Agreement.

88.     As another example, in a 2016 presentation to the American Pharmacists Association, the DEA reiterated that retail pharmacies must watch for red flags such as: large numbers of customers who: receive the same combination of prescriptions, receive the same strength of controlled substance prescription (often for the strongest dose), have prescriptions from the same prescriber, and have the same diagnosis code.

89.     Red flags are common sense warning signs that have always been an important component of controlled substance pharmacy best practices, not a novel concept to pharmacies. Relevant guidance concerning narcotics dispensing dates back to at least since the 1930's and 1940's there has been guidance given to pharmacies and pharmacists related to the creation of systems and programs to guard against diversion and lists of don'ts when dispensing narcotics. DEA enforcement actions such as the *Holiday* decision, *Medicine Shoppe-Jonesborough* and *United Prescription Services, Inc.* also hold pharmacies responsible for failing to fulfill their corresponding responsibility under the CSA.

---

[4] Id.

90.     Trade organizations in which Defendants have actively participated have acknowledged that distributors have been responsible for reporting suspicious orders for more than 40 years.  The National Association of Chain Drug Stores ("NACDS") is a national trade association that represents traditional drug stores, supermarkets, and mass merchants with pharmacies—from regional chains with four stores to national companies.  Its members and/or affiliate members also include stakeholders such as manufacturers, other distributors and other trade organizations as well.  Most of the Defendants serve on the Board of Directors of NACDS. As controlling members of NACDS, the Defendants have served on and run key governing committees within the organization.  Defendants have repeatedly chaired NACDS's Board of Directors, which determines the "strategic plan and positions" of the organization.  During the last 12 years, representatives of CVS, Walgreens, Walmart, and Rite Aid have always held Board of Directors or officer seats.

91.     The Healthcare Distribution Management Association ("HDMA," now known as the Healthcare Distribution Alliance ("HDA"), and prior to 2000, known as the National Wholesale Druggists' Association ("NWDA")), is a national trade association representing distributors that has partnered with NACDS.  The two groups viewed their relationship as a strategic "alliance."  CVS also has been a member of the HDA.

92.     In 2006, the NACDS issued a "Model Compliance Manual" intended to "assist NACDS members" in developing their own compliance programs.  The Model Compliance Manual notes that a retail pharmacy may "generate and review reports for its own purposes" and refers to the assessment tools identified by CMS in its Prescription Drug Benefit Manual chapter on fraud, waste and abuse, including:

> Drug Utilization Reports, which identify the number of prescriptions filled for a particular customer and, in particular,

numbers for suspect classes of drugs such as narcotics to identify possible therapeutic abuse or illegal activity by a customer. A customer with an abnormal number of prescriptions or prescription patterns for certain drugs should be identified in reports, and the customer and his or her prescribing providers can be contacted and explanations for use can be received.

Prescribing Patterns by Physician Reports, which identify the number of prescriptions written by a particular provider and focus on a class or particular type of drug such as narcotics. These reports can be generated to identify possible prescriber or other fraud.

Geographic Zip Reports, which identify possible "doctor shopping" schemes or "script mills" by comparing the geographic location (zip code) of the patient to the location of the provider who wrote the prescription and should include the location of the dispensing pharmacy.

93.     In 2007 and 2008, the HDA, began developing "Industry Compliance Guidelines" ("ICG") that aimed to outline certain "best practices" for distributors of controlled substances. As part of its development of the ICG, the HDA met with the DEA on at least three occasions. The HDA also sought extensive input from its membership, as well as other groups such as the Pain Care Forum. Internal discussions concerning the ICG further demonstrate the industry's knowledge of what was expected of them. For example, when deciding whether or not the guidelines should permit a distributor to still ship a part of an order identified as suspicious, the HDA noted that one potential downside of this approach was that "DEA correspondence/interpretation do not support this practice."

94.     In September 2007, the NACDS, among others, also attended a DEA conference at which the DEA reminded registrants that not only were they required to report suspicious orders, but also to halt shipments of suspicious orders. Walgreens, specifically, registered for the conference.

95.     The HDA released the ICG in 2008 and, in doing so, it emphasized that distributors were "[a]t the center of a sophisticated supply chain" and "uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."[5]

96.     Defendants and their trade organizations, including the HDMA and the NACDS, also participated in creating a "Stakeholders" memorandum that acknowledges many of the red flags that indicate potential diversion prescriptions.   These include for example, traveling unexplainable and/or unreasonably long distance to a physician office and/or the pharmacy, a controlled substance refill pattern inconsistent with regular refill patterns for non-controlled substances, or a prescription that a pharmacist knows or reasonably believes another pharmacy refused to fill.   The "Stakeholders" memorandum acknowledges the danger of "therapeutic duplication of two or more long-acting and/or two or more short-acting opiates (cocktails)" and "patient presents prescriptions for highly abused 'cocktails' (combination of opiate, benzodiazepine, and muscle relaxant) of controlled substance medications (cocktails)."   The "cocktail" often referred to as the "Holy Trinity" consists of an opioid, a benzodiazepine, and a muscle-relaxer such as carisoprodol.   A "trinity" combination can also refer to different combinations of opioid/non-opioid prescriptions intended for abuse and to create a euphoric feeling similar to heroin and other illicit drugs.   Medical literature has long recognized the special dangers posed by cocktails composed of drugs of abuse which lack any documented medical efficacy."   Similarly, the *East Main Street Pharmacy* action acknowledged that "the combination

---

[5] Healthcare Distribution Management Association (HDMA) Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, filed in Cardinal Health, Inc. v. Holder, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B at 1).

of a benzodiazepine, a narcotic and carisoprodol is well known in the pharmacy profession as being used by patients abusing prescription drugs."

97.     While carisoprodol was not controlled under federal law, it is controlled under various state laws and is highly popular with drug abusers, especially when taken as part of a drug cocktail that includes an opiate and a benzodiazepine. *See Your Druggist Pharmacy*, 73 Fed. Reg. 75,774, 75,775 n.1 (DEA Dec. 2008). Other DEA and judicial decisions likewise acknowledge well-known and highly abused cocktails. *See, e.g., U.S. v. Evans*, 892 F.3d 692, 706 (5th Cir. 2018).

98.     More recently, in the appeal that arose from DEA's enforcement action against wholesaler Masters Pharmaceuticals, Inc. for its distribution of opioids, the HDA and NACDS submitted a joint amicus brief regarding the legal duty of distributors that acknowledged that "HDMA and NACDS members" had a duty to prevent diversion." *See Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin.*, 2016 WL 1321983 (D.C. Cir. April 4, 2016). As described below, both the HDA and NACDS have both long taken the position that distributors have responsibilities to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations do so, but "as responsible members of society."

99.     The requirement to report suspicious orders at the time (not after the fact) has always been clear and Defendants themselves have acknowledged as much through their various trade groups and associations. As described above, correspondence between the NWDA and the DEA, as early as 1984, illustrates that the DEA provided clear guidance well before the opioid crisis was unleashed. For example, in one letter to the NWDA, DEA Section Chief Thomas Gitchel emphasized that "the submission of a monthly printout of after-the-fact sales will not relieve a registrant from the responsibility of reporting excessive or suspicious orders," noting

"DEA has interpreted 'orders' to mean prior to shipment." Consistent with that understanding, the NWDA's 1984 Guidelines repeated the same directive.

**D.    Defendants Failed to Comply with Their Duties and Failed to Provide Effective Controls Against Diversion**

100.    As detailed below, Defendants failed to comply with their obligations under the common law and under the CSA. They failed to identify and halt shipments of suspicious orders, and failed to perform appropriate due diligence on red flag prescriptions. As a result, Defendants dispensed large quantities of red-flag prescriptions with indicia of diversion, and, at the wholesale level, dispensed to their stores the controlled substances to fill those red-flag prescriptions.

101.    According to the CDC, opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S. Not all of these prescriptions were legitimate. Yet Defendants systemically ignored red flags that they were fueling a black market, and failed to maintain effective controls against diversion at both the wholesale and retail pharmacy level. Instead, they put profits over the public health and safety. Despite their legal obligations as registrants under the federal Controlled Substances Act, 21 U.S.C. § 801 et seq. ("CSA"), Defendants allowed widespread diversion to occur—and they did so knowingly.

102.    This problem was compounded by Defendants' failure to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate and what measures and/or actions to take when a prescription is identified as potentially illegitimate.

103.     Defendants also failed to put in place effective policies and procedures to prevent their stores from facilitating diversion and selling into a black market, and to conduct adequate internal or external reviews of their opioid sales to identify patterns regarding prescriptions that should not have been filled, or if they conducted such reviews, they failed to take any meaningful action as a result.

104.     Even where Defendants enacted policies and procedures to prevent stores from facilitating diversion and selling into a black market, such policies were merely window-dressing and were not employed in any meaningful way.

105.     Defendants also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.  Instead, Defendants put in place policies that required and rewarded speed in filling prescriptions and volume of sales over safety and the care necessary to ensure that narcotics were distributed and sold lawfully.

1.     **Defendants Were Uniquely Positioned to Prevent Diversion and Had in Their Possession Data that Would Have Permitted Them to Identify Suspicious Orders and-Red-Flag Prescriptions, But Failed to Make Use of this Information**

106.     Defendants had in their possession information and tools to assist in the identification of suspicious orders and illegitimate prescriptions, but failed to make use of this data for that purpose, and failed to make the information they had available to their pharmacists who would need to identify the red-flag prescriptions and perform the due diligence.

107.     Pharmacy chains collect and maintain data that provides detailed insight into the volume, frequency, dose, and type of controlled and non-controlled substances a pharmacy typically orders. This includes non-controlled substances and Schedule IV controlled substances (such as benzodiazepines), which are not reported to the DEA, but whose use together with opioids

29

can be indicative of diversion. Pharmacy chains also collect and maintain data regarding every prescription dispensed at each of their stores, including information about the prescriber as well as the person filling the prescription. This information can assist in the identification of pill mills and drug-seeking patients, facilitating the identification of illegitimate prescriptions and patterns of diversion.

108.    As acknowledged in an article published by CVS employees in the *New England Journal of Medicine*, "[p]harmacies have a role to play in the oversight of prescriptions for controlled substances, and opioid analgesics in particular." Mitch Betses, R.Ph., and Troyen Brennan, M.D., M.P.H., *Abusive Prescribing of Controlled Substances - A Pharmacy View*, N. ENGL. J. MED. 369;11, Sept. 12., 2013, at 989-991. The DEA has identified "both pharmaceutical distributors and Defendants as part of the problem" contributing to opioid abuse and related deaths. *Id.*

109.    Defendants have a particular "advantage" in meeting their obligations under the CSA because these entities can use "aggregated information on all prescriptions filled at the chain" in order to examine "patterns" of opioids and other "high-risk drugs" and target "inappropriate prescribing." *Id.* at 990. For example, a chain pharmacy should use its chain wide dispensing data to identify "high risk prescribers" by "benchmarking" prescription data based on "several parameters," including "volume of prescriptions for high-risk drugs," "the proportion of the prescriber's prescriptions that were for such [high-risk] drugs, as compared with the volume and proportion for others in the same specialty and region," cash payment, ages of patients, and the prescriber's ratio of "prescriptions for noncontrolled substances with prescriptions for controlled substances." *Id.* This "[a]nalysis of aggregated data" from Defendants can "target patterns of

abuse," in the face of "the growing use of controlled substances and resulting illnesses and deaths." *Id.* Accordingly, as CVS admits, "innovative use of transparent data is only prudent." *Id.*

110.    As CVS counseled, Defendants may not ignore red flags of illegal conduct and must use the information available to them to identify, report, and not fill prescriptions that seem indicative of diversion. That includes reviewing their own data, relying on their observations of prescribers, pharmacies, and customers, and following up on reports or concerns of potential diversion.

111.    Pharmacies' evaluation process includes what is known as "Drug Utilization Review" or "DUR." This practice is both part of traditional roles and duties and codified in federal and state statutes. Notably, during the rulemaking practice for one authority, the Omnibus Budget [R]econciliation Act of 1990, a commenter suggested that instructions for compliance with prospective DUR should go to the pharmacist and not the pharmacy. In response, the government stated that "the instructions for compliance with prospective DUR should be directed to the pharmacies," and that "[t]he owners or managers of pharmacies, as Medicaid providers, are responsible for furnishing their staff with information pertaining to DUR." States, seeking to assure uniformity, have taken action to require the same mandates as this federal law. The DUR process includes looking at over-utilization, drug interactions and identifying abuse and misuse of dangerous drugs such as opioids. This process would have provided Defendants information about potential diversion as well.

112.    Accordingly, states, including Connecticut, revised and expanded practice acts and rules and increased their support for, and reliance on, Prescription Drug Monitoring Programs ("PDMPs").

31

113.     Defendants themselves recognized the value of the tools available to them through PMDPs.  An internal CVS document, for example, characterized PDMPs as an "invaluable tool for Pharmacists to prevent controlled substances from being diverted or dispensed for non-medical purposes ...."  It also described PDMPs as "cut[ting] down on prescription fraud and 'doctor shopping' by providing Prescribers and Pharmacists with more complete information about a patient's controlled substance prescription history."  Separately, data also suggests that PDMP utilization assists in detecting possible misuse and diversion of controlled substances.

114.     Additionally, Defendants have operating systems and methods to store and retain prescription dispensing data and records.  The information they possess must be readily retrievable, and they have an obligation to use it to identify patterns of diversion, conduct internal audits and training programs, investigate suspicious prescribers, patients, and pharmacists, and prevent diversion of controlled substances.  Their hiring, training, and management of pharmacy personnel, and their supporting policies, procedures, and systems should and must promote public health and safety and assist in the identification and prevention of the diversion of controlled substances.

115.     Not only do Defendants often have firsthand knowledge of dispensing red flags—such as distant geographic location of doctors from the pharmacy or customer, lines of seemingly healthy patients, cash transactions, and other significant information—but they also have the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores. As with other distributors, these data points give Defendants insight into prescribing and dispensing conduct that enables them to prevent diversion and fulfil their obligations under the CSA.

116.    Indeed, CVS Health president and CEO Larry Merlo has described the company as "America's front door to health care with a presence in nearly 10,000 communities across the country," which allowed it to "see firsthand the impact of the alarming and rapidly growing epidemic of opioid addiction and misuse."[6]

117.    Defendants not only make observations through their local front doors, but have extensive data to which an individual pharmacist would not have access.  They are uniquely positioned to monitor, for example, the volume of opioids being dispensed in their pharmacies relative to the size of the communities they serve.  This is particularly important given that it is recognized that as to the supply of opioids increases, so does the incidence of over-dose and death. They could also use this information to monitor potentially suspicious prescribers.  Pharmacies must use the information available to them to guard against supplying controlled substances for non-medical use, identify red flags or potential diversion and should share this information with their agents, as well as provide clear guidance and training on how to use it.  A former DEA diversion investigator, whose testimony is also referenced above, testified in a deposition in the federal opioid multidistrict litigation ("MDL") that as part of their obligation under Section 1301.71, pharmacies corporately have an obligation to develop policies to train pharmacists to comply the CSA regulations.  She further testified that the Defendants had an obligation to develop and implement systems to provide the necessary tools for their pharmacists to comply with the CSA regulations.

118.    As explained above, in addition to their duties as distributors, Defendants also had a duty to design and implement systems to prevent diversion of controlled substances in their retail

---

[6] See, e.g., David Salazar, CVS Health Unveils New PBM, Pharmacy Efforts to Curb Opioid Abuse, (Sept. 21, 2017), https://drugstorenews.com/pharmacy/cvs-health-unveils-new-pbm-pharmacy-efforts-curb-opioid-abuse

pharmacy operations. Specifically, Defendants had a duty to analyze data and the personal observations of their employees for known red flags such as those described above. Defendants had the ability, and the obligation, to look for these red flags on a patient, prescriber, store, and chain level, and to refuse to fill and to report prescriptions that suggested potential diversion.

119.     Defendants were particularly well-positioned to do so given the dispensing data available to them, which they could review at the corporate level to identify patterns of diversion and to create policies and practices to proactively identified patterns of diversion. Each could and should have also developed tools and programs to alert their pharmacists to red flags and to guard against diversion.

120.     Defendants also possessed sufficiently detailed and valuable information that other companies were willing to pay them for it.

121.     In 2010, for example, Walgreen's fiscal year 2010 SEC Form 10-K disclosed that it recognizes "purchased prescription files" as "intangible assets" valued at $749,000,000.[7] In addition, Walgreens's own advertising has acknowledged that Walgreens has centralized data such that customers' "complete prescription records" from Walgreens's "thousands of locations nationwide" are *"instantly available."*

122.     CVS's Director of Managed Care Operations, Scott Tierney, testified that CVS's data vendors included IMS Health, Verispan, and Walters Kluwers and that CVS used the vendors for "analysis and aggregation of data" and "some consulting services." He also testified that CVS would provide the vendors with "prescriber level data, drug level data, plan level data, [and] de-identified patient data."[8]

---

[7] https://www.sec.gov/Archives/edgar/data/104207/000010420710000098/exhibit_13.htm
[8] Joint Appendix in Sorrell v. IMS Health Inc., No. 10-779, 2011 WL 687134 (U.S.) *245-46 (Feb. 22, 2011).

123.     Each of Defendants had complete access to all prescription opioid dispensing data related to its pharmacies in and around Plaintiffs' communities, complete access to information revealing the doctors who prescribed the opioids dispensed in its pharmacies in and around Plaintiffs' communities, and complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in and around Plaintiffs' communities. Each of Defendants likewise had complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in and around Plaintiffs' communities, complete access to information revealing the opioids prescriptions dispensed by its pharmacies in and around Plaintiffs' communities, and complete access to information revealing the opioids prescriptions dispensed by its pharmacies in and around Plaintiffs' communities. Further, each of Defendants had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by its pharmacies in and around Plaintiffs' communities and complete access to information revealing the size and frequency of prescriptions written by specific doctors across its pharmacies in and around Plaintiffs' communities.

124.     Defendants failed to fulfill their legal duties and instead routinely distributed and/or dispensed controlled substances while ignoring red flags of diversion and abuse.  The unlawful conduct by these Defendants is a substantial cause for the volume of prescription opioids and the public nuisance plaguing the County.

### 2.     Walgreens  Failed to Maintain Effective Controls against Diversion

125.     Following a 2022 bench trial in federal court in San Francisco, the court held that Walgreens was liable for substantially contributing to the public nuisance of the opioid crisis in San Francisco because (i) Walgreens had engaged in unreasonable conduct by dispensing hundreds of thousands of red flag opioid prescriptions without due diligence in violation of 21 C.F.R.

§ 1306.04(a) and (ii) Walgreens failed to implement an effective suspicious order monitoring system in violation of 21 C.F.R. § 1301.74. Findings of Fact and Conclusions of Law Regarding Walgreens, *City and County of San Francisco v. Purdue Pharma L.P.*, Case No. 18-cv-07591-CRB, Doc. No. 1578, filed 8/10/22. Regarding the sufficiency of the evidence, the court said, "The aggregate evidence that Plaintiff presented at trial was not only adequate to establish Walgreens' culpability—it was devastating." *Id.* at 105 While the court's focus was on the impact of Walgreens' conduct in San Francisco, the policies, practices, and procedures followed by Walgreens in San Francisco were nation-wide policies, practices, and procedures that were followed by Walgreens in Connecticut and in Plaintiffs' communities in the same was as they were followed in San Francisco. In particular, the court found that "Walgreens' 'fill, fill, fill' culture prevented pharmacists from consistently resolving red flags before dispensing prescriptions." *Id.* at 94.

126. Acting as both a distributor and a retail pharmacy chain, Walgreens self-distributed opioids to its own individual Walgreens pharmacies. Although Walgreens had visibility into indicia of diversion due to its distribution and dispensing practices, it failed to take these factors into account in its SOM program during the vast majority of the time it was distributing prescription opioids. Moreover, its program was wholly inadequate and did not fulfill its duties to prevent diversion.

127. Walgreens also failed to maintain effective controls against diversion from its pharmacy stores.

128. Though Walgreens had access to significant information about indicia of diversion, Walgreens failed to use available information to monitor and effectively prevent diversion.

129.    At least as early as 1998, and perhaps as early as 1988, Walgreens began to utilize a series of formulas to identify orders that Walgreens deemed to be potentially suspicious based on the orders' extraordinary size.  These orders were listed on a report called the Suspicious Control Drug Order report.

130.    Walgreens used two different formulas: one formula from (at least) 1998-2007 and another formula from March 2007 through 2012.  These formulas were alike in that they each utilized an average number based on historical orders, applied a three times multiplier to that base number, and then deemed certain orders which were greater than that number to be suspicious.  Under the later formula, orders were only listed on the report as being suspicious if the orders exceeded the three times multiplier for two consecutive months in a given time period.  Walgreens based this second formula on the DEA's Chemical Handler's Manual's order monitoring system for listed chemicals.

131.    The first variation on this formula was in place until March 2007, even though the DEA warned Walgreens that the "formulation utilized by the firm for reporting suspicious ordering of controlled substances was insufficient," *via* a May 2006 Letter of Admonition.  The Letter cited Walgreens for controlled substances violations at its Perrysburg, Ohio Distribution Center, but highlighted problems that went far beyond that particular facility.

132.    The DEA also reminded Walgreens that its suspicious ordering "formula should be based on (size, pattern, frequency)," though Walgreens failed to even examine anything other than the size of an order.  When Walgreens did update its program some ten months later, however, it still did not perform the size, pattern, and frequency analysis prescribed by the DEA, continuing to use another "three times" formula.

133.    Even with its ample threshold, each Walgreens Suspicious Control Drug Order report could be thousands of pages or more in length.

134.    Walgreens did not perform any due diligence on the thousands of orders identified on the Suspicious Control Drug Order reports but instead shipped the orders without review.

135.    Walgreens did not report the suspicious orders listed on the Suspicious Control Drug Order report until *after* the orders were already filled and shipped. The report was generated on a monthly, nationwide basis, directly contravening the regulatory requirement that suspicious orders be reported *when discovered*. 21 C.F.R. 1301.74(b). In some instances, months may have elapsed between an order's shipment and its subsequent reporting to the DEA, given the requirement, described above, of two consecutive months of exceeding the three times multiplier to trigger reporting.

136.    In September 2012, the DEA issued an immediate suspension order ("ISO") regarding one of Walgreens's three Schedule II distribution centers, finding Walgreens's distribution practices constituted an "imminent danger to the public health and safety" and were "inconsistent with the public interest." The DEA further found that Walgreens's Jupiter distribution center failed to comply with DEA regulations that required it to report to the DEA suspicious drug orders that Walgreens received from its retail pharmacies, resulting in at least tens of thousands of violations, particularly concerning massive volumes of prescription opiates. There, the DEA stated: "Notwithstanding the ample guidance available, Walgreens has failed to maintain an adequate suspicious order reporting system and as a result, has ignored readily identifiable orders and ordering patterns that, based on the information available throughout the Walgreens Corporation, should have been obvious signs of diversion occurring at [its] customer pharmacies."

137.    In the ISO, the DEA also specifically considered the Suspicious Control Drug Order reports and made the following further findings of fact and conclusions of law regarding the reports and Walgreens's suspicious order monitoring system—applicable across Walgreens's operations:

> "[Walgreens's] practice with regard to suspicious order reporting was to send to the local DEA field office a monthly report labeled 'Suspicious Control Drug Orders.'"

> "[The Suspicious Control Drug] reports, consisting of nothing more than an aggregate of completed transactions, did not comply with the requirement to report suspicious orders as discovered, despite the title [Walgreens] attached to these reports."

> Upon review of an example of the Suspicious Control Drug Order report for December 2011, "[Walgreens's] suspicious order report for December 2011 appears to include suspicious orders placed by its customers for the past 6 months. The report for just suspicious orders of Schedule II drugs is 1712 pages and includes reports on approximately 836 pharmacies in more than a dozen states and Puerto Rico."

> Finding that the reports failed to appropriately consider the population and area being served by the pharmacy: "This report from the Jupiter [Florida] Distribution Center covers pharmacies in multiple states and Puerto Rico, yet the average order and trigger amount is the same for a particular drug regardless of the pharmacy's location, the population it serves, or the number of other pharmacies in the area."

> "As made clear in 21 CFR§ 1301.74(b), Southwood, and the December 27, 2007 letter to distributors from the Deputy Assistant Administrator for the Office of Diversion Control, suspicious orders are to be reported as discovered, not in a collection of monthly completed transactions. Moreover, commensurate with the obligation to identify and report suspicious orders as they are discovered is the obligation to conduct meaningful due diligence in an investigation of the customer and the particular order to resolve the suspicion and verify that the order is actually being used to fulfill legitimate medical needs. This analysis must take place before the

order is shipped. No order identified as suspicious should be fulfilled until an assessment of the order's legitimacy is concluded."

"DEA's investigation of [Walgreens] revealed that Walgreens failed to detect and report suspicious orders by its pharmacy customers, in violation of 21 C.F.R. §1301.74(b). 21 C.F.R. § 1301.74(b)."

"DEA investigation of [Walgreens's] distribution practices and policies ... demonstrates that [Walgreens] has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of 21 U.S.C. 55 823(b)(l and (e)(l). [Walgreens] failed to conduct adequate due diligence of its retail stores, including but not limited to, the six stores identified above, and continued to distribute large amounts of controlled substances to pharmacies that it knew or should have known were dispensing those controlled substances pursuant to prescriptions written for other than a legitimate medical purpose by practitioners acting outside the usual course of their professional practice. [Walgreens has not] recognized and adequately reformed the systemic shortcomings discussed herein."

"[DEA's] concerns with [Walgreens'] distribution practices are not limited to the six Walgreens pharmacies [for which DEA suspended Walgreens' dispensing registration]."

138.    Walgreens knew its procedures were inadequate well before the 2012 ISO was issued.  In addition to the guidance described above, in 1988, the DEA specifically advised Walgreens that "[t]he submission of a monthly printout of after-the-fact sales does *not* relieve the registrant of the responsibility of reporting excessive or suspicious orders."  The DEA further advised Walgreens that, while "[a]n electronic data system may provide the means and mechanism for complying with the regulations...the system is not complete until the data is carefully reviewed and monitored by the registrant."

139.    Despite this instruction, there is no evidence that Walgreens ever took any action related to the Suspicious Control Drug Order report besides generating it and mailing it out.  Walgreens has admitted that there is no evidence that Walgreens ever performed a due diligence

review on any of the orders listed on the Suspicious Control Drug Order report before shipment. One of the managers for Walgreens's Pharmaceutical Integrity ("RX Integrity") Department stated that, when he was with the Loss Prevention Department, he "basically burned the data on a CD and sent it off. I didn't dive into each individual report or CD" and that he "would look at it briefly, but just to see if the data transferred to the CD, but that's about the extent." In an errata submitted in connection with a deposition in the MDL, Walgreens acknowledged that it "is currently unaware of due diligence that was performed based on orders being flagged . . ."

140.    As described above, in May 2006, the DEA told Walgreens again that the formula Walgreens was using to identify suspicious orders for the Suspicious Control Drug Order reports was "insufficient" and "inadequate."

141.    Moreover, in September 2007, three Walgreens's senior employees (Dwayne Pinon, Senior Attorney; James Van Overbake, Auditor; and Irene Lerin, Audit Manager) attended the DEA Office of Diversion Control's 13th Pharmaceutical Industry Conference in Houston, Texas.  Michael Mapes, Chief, DEA, Regulatory Section, gave a presentation at this Conference relating to suspicious orders, which included the reminder that the CSA "requirement is to report suspicious orders, not suspicious sales after the fact."  Participant notes from this meeting indicate that Mr. Mapes advised the audience not to "confuse suspicious order report with an excessive purchase report.  They are two different things."

142.    Similarly, handwritten notes on an internal document from July 2008 state that "DEA really wants us to validate orders and only report true suspicious orders or what was done to approve orders."  They go on to state that "[j]ust reporting these orders is not good enough – need to document what happened."

41

143.    Though Walgreens claims that it implemented the three times formula based on DEA guidance, DEA never approved Walgreens's SOM system, or any use of the Appendix E-3 formula, during the course of DEA's cyclic or scheduled investigations of Walgreens's distribution centers. As DEA 30b6 witness Clare Brennan testified, while DEA investigators are trained to ensure a SOM system is in place, they are also trained not to approve any SOM system. This non-approval, the impropriety of any attempt by Walgreens to rely on prior purported approval, and the compliance failures of Walgreens's then utilized system, were re-emphasized by the letter Walgreens—and all controlled substance distributors—received from the DEA in 2007.

144.    Walgreens's knew that its post-2006 SOM system did not comply with CSA requirements. Walgreen's did not maintain an effective system to stop the shipment of suspicious orders before investigating and resolving them.

145.    The Walgreens controlled substances Distribution Center personnel who spoke to the DEA during the DEA's inspections of Walgreens's controlled substances distribution centers did not recall ever telling the DEA that Walgreens internally determined that Walgreens's SOM system contained no monitoring process, that the SOM system did not stop suspicious orders from being shipped, that Walgreens could be filling illicit orders, or that the orders Walgreens was reported to the DEA as suspicious had already been shipped.

146.    Additionally, in November 2012, the Walgreens's Divisional Vice President of Pharmacy Services reported to Kermit Crawford, Walgreens's President of Pharmacy, Health and Wellness, his notes from meeting with the DEA about reporting suspicious orders, which included the note, "[i]f suspicious - you don't ship."

147.    Walgreens nominally employed additional procedures within its distribution centers; however, these systems did not address the failings of the Suspicious Control Drug Order

reports. These distribution center systems were not designed to detect suspicious orders of controlled substances, but rather were designed to detect typos or errors in order entry by the stores. Walgreens admits that its Distribution Centers are "more akin to supply warehouses," are "not designed to be a backstop to pharmacists," and that they are not well "equipped to ensure compliance" or to "assist in combatting controlled substance abuse," and "do not have the ability to detect trends in local markets."

148.    The Distribution Center ("DC") level procedures are documented in a 2006 Questionable Order Quantity policy, which had two facets: first, it instructed DC personnel to review orders and contact the pharmacy with questions regarding quantities. The policy did not mention reporting suspicious orders until 2010, when it was updated to state that the Corporate Office Internal Audit Department would handle suspicious store orders and inquiries. There is no evidence that the Internal Audit department had any involvement in reporting suspicious orders.

149.    The second aspect of this DC level procedures required "pickers," the DC personnel who actually retrieved pill bottles off the shelves and placed them into totes for shipping, to look for "questionable" orders while picking.

150.    The only review of the orders identified by the DC level procedures was calling the pharmacy to make sure the order had not been entered in error. Walgreens admitted this procedure was not intended to detect suspicious orders. There is no evidence that any orders were ever reported as suspicious or halted as a result of Walgreens's distribution-center level policies. There is no evidence these procedures resulted in timely reporting of, due diligence on, or non-shipment of any order, including those listed as being "suspicious" on the Suspicious Control Drug Order reports.

151.    Walgreens's documents effectively acknowledge that these were not true anti-diversion measures, and it recognized internally that it did not begin creating a SOM system until March 2008.  Specifically, in March 2008, Walgreens finally formed a five department "team" to "begin creating" a SOM program.  The new SOM program was not piloted until more than a year later, in August 2009, and even then, the pilot included orders form just seven stores.  Not until September 2010 would the program, implemented in pieces and phases, be rolled out chain-wide, and from that point it took several more years to fully implement.

152.    Through 2012, Walgreens continued to populate the Suspicious Control Drug Order report with thousands of orders that exceeded Walgreens's "three times" test, showing that Walgreens's post-2009 SOM program did little to mitigate the extraordinary volume of controlled substances being shipped by Walgreens to its pharmacies.

153.    Walgreens did not prioritize compliance when instituting its SOM system. Testimony from the Senior Director of the Walgreen's Pharmaceutical Integrity Department, which is charged with supervising Walgreens's SOM system, revealed that even as late as 2012, 2013, and 2014, Walgreens's viewed the SOM system as an inventory control mechanism rather than as a compliance control mechanism:

> Q: Now, Walgreens's system, similar to my alarm, is there to detect a potential red flag. Would you agree with that?
>
> It was put in place to ensure that the stores had the proper quantities. Not necessarily to . . . detect a red flag. The whole idea was to make sure that the stores were getting the quantities that they needed based on their peer group.

154.    Perhaps because keeping supply moving, as opposed to preventing diversion, was Walgreens's primary focus, the SOM program Walgreens slowly developed had significant gaps or loopholes. For example, for the first few years, the program did not include orders that

Walgreens stores were also placing to outside vendors, like Cardinal and AmerisourceBergen, allowing stores to order opioids from Walgreens distribution centers and from Cardinal and AmerisourceBergen, effectively permitting double dipping. It also did not prevent stores from placing an order to an outside vendor if the store attempted to place the order to a Walgreens DC, but was rejected by the new SOM system.

155.    The new SOM-lite system also allowed Walgreens's stores to transfer controlled substances between stores and did not review these transfers (known as "interstores") within the SOM program, so that these transfers were not factored into SOM analytics. Additionally, stores could also place ad hoc "PDQ" ("pretty darn quick") orders for controlled substances outside of their normal order days and outside of the SOM analysis and limits. Walgreens could even remove a store entirely from SOM review.

156.    Further, although the new SOM algorithm identified more than 389 pages of suspicious orders per week as of August 2010, it failed to identify all the orders that Walgreens had marked as suspicious under its "three times" formulas and previously listed on its Suspicious Control Drug Order reports and submitted to the DEA "on a monthly basis." This "discrepancy" prompted an internal email from an employee in Walgreens's Loss Prevention Department, to Walgreens's Vice President, Distribution Centers and Logistics, suggesting that "the new system should be tested further and enhanced to provide broader coverage of controlled substance activity. The same e-mail stated that "we are not equipped to handle the 389+ pages of ADR4 [suspicious order monitoring] data which are compiled nationwide each week," and asked if his department had "a resource available" to assist. An email in response "recall[ed] the old paper report as being inches thick" and an instruction "in 1985 not to review or contact anyone on the data," and inquired, among other things, "[w]ho from your group has been reviewing the data collected for

the past twenty-five years?" and "[a]t present is anyone doing any review on what would be considered suspicious quantities that are physically ordered and are releasing to stores?"

157.     Starting in 2010, certain orders that exceeded store-based limits imposed by Walgreens's new SOM system were reduced to the store limit and shipped out.  These orders were not reported to the DEA as suspicious, nor were they halted for review.  The DEA found that Walgreens's policy of reducing and then filling and shipping suspicious orders without reporting them violated the law:

158.     Walgreens's post-2009 SOM system flagged thousands of items per month as being suspicious. Internal Walgreens documents indicate that, in July 2011 alone, as many as 20,699 orders for controlled substances were "marked suspicious" by the new algorithm. However, very few of these orders received any review, and any review performed was nominal at best.  Meanwhile, Walgreens failed to adequately staff the program and to train its employees regarding its requirements.

159.     Walgreens cited two people as being primarily responsible for performing due diligence on suspicious orders in the 2009-2012 time period under the new SOM system.   The first was a representative from the Loss Prevention department who said her department was "not equipped" to handle review and data analysis for the hundreds of pages of reports being compiled nationwide each week.  The second was Barbara Martin, who estimated that she spent somewhere between one and three hours a week reviewing suspicious orders, reviewing only between 10 to 100 of the thousands of orders that were deemed suspicious under the new algorithm.  Walgreens did not provide Ms. Martin access to information about the area the store was serving, the order history for comparable stores, or any other data beyond the sales and order history for that store. If an order did not "make sense" to her based on those limited resources, she testified that she

would call the store or district manager or pharmacy supervisor. She lacked authority to take "direct action" on an order.

160.   Walgreens has previously cited to a series of email exchanges with Ms. Martin and her deposition testimony as exemplars of its due diligence procedures under the post-2009 SOM program. In the emails, which date from January 10–11, 2011, and are between Ms. Martin and a Walgreens DC employee, the DC employee notes that "several stores that are ordering huge quantities of 682971 [30 mg oxycodone] on a regular basis." The DC employee continued, with respect to a single store, "we have shipped them 3271 bottles [of 30 mg oxycodone] between 12/1/10 and 1/10/11. I don't know how they can even house this many bottles to be honest. How do we go about checking the validity of these orders?" Ms. Martin noted that the store had average weekly sales of 36,200 dosage units, which was equal to 362 bottles per week, stating, "I have no idea where these stores are getting this type of volume. The last pharmacy I was manager at did about 525 rxs/day and we sold about 500 tabs a month (5 bottles)." Ms. Martin then told the DC employee that she could call the district pharmacy supervisor to see if he "may be able to shed some light on the subject." Despite the fact that questions had been raised about this store ordering volume in January 2011, the very next month, Walgreens filled and shipped orders totaling another 285,800 dosage units of 30 milligram oxycodone to the same pharmacy, which was located in a town of less than 3,000 people.

161.   In her deposition, Ms. Martin stated that she never even attempted to determine the size of the community that was receiving these "huge quantities" of oxycodone. She further testified that she was not near that store, did not have access to the store's prescriptions or patient information, and as noted above, couldn't take any "direct action." Approximately 18 months

after this email exchange, as a result of DEA action, Walgreens agreed to surrender its DEA registration for this same store that Ms. Martin reviewed as part of her exemplary "due diligence."

162.     In the ISO regarding the Distribution Center, the DEA found specifically regarding the orders that were the subject of these email exchanges, that "[b]ased on the evidence available to DEA, none of these orders were reported to DEA as suspicious and all appear to have been shipped, without any further due diligence to verify their legitimacy."  The DEA further found regarding this purported "due diligence," that Walgreens "failed to conduct any meaningful investigation or analysis to ensure that the massive amounts of commonly abused, highly addictive controlled substances being ordered by these pharmacies were not being diverted into other than legitimate channels."  The DEA noted that "[Walgreens] has been unable to provide any files related to any effort to adequately verify the legitimacy of any particular order it shipped to its customer stores."

163.     These failures were not limited to the specific Florida pharmacies and distribution center described above; instead, they reflect systemic failures of Walgreens's SOM system that impacted its distribution in Connecticut as well.  Walgreens admits that the SOM systems and procedures at all of its DCs were the same, including those at the facilities that continued shipping opioids into Connecticut.  Accordingly, it is not surprising that, in February 2013, the DEA issued similar Subpoenas and Warrant of Inspection on the Perrysburg DC in Ohio to those issued to the Jupiter DC in Florida.  Walgreens employees made plans in preparation for the Perrysburg DC being "shut down" by the DEA, like the Jupiter DC.  Within weeks of receiving the six subpoenas and warrant, Walgreens decided to "discontinue distribution of controlled substances from the Perrysburg facility" in order to "eliminate any immediate need for further DEA administrative action" regarding the Perrysburg facility.

164.    Further, after the DEA began its investigation, Walgreens held meetings with and informed the DEA that it was implementing "new changes" to "enhance" its SOM program. Internal documents reveal that Walgreens improved its SOM program only "in an effort to convince the DEA that the proposed penalty is excessive."

165.    Even so, by November 2012, the program still did not halt the orders for due diligence evaluation or report the orders as suspicious. Further, at that time, the program began to automatically reduce orders that violated ceiling thresholds.

166.    There also is no evidence that these flagged or cut orders were reported as suspicious to the regulatory authorities.

167.    As a result of the DEA investigation, Walgreens formed the "Rx Integrity Team" in 2012, purportedly to make sure that those types of failures did not continue. However, the group's true role was protecting Walgreens's Distribution Centers and stores from losing their DEA licenses. The effort was only for show. Walgreens never provided the Rx Integrity group the resources needed to achieve due diligence on the large number of orders identified by Walgreen's SOM program for the company's 5,000 plus stores.

168.    In December 2012, the further enhanced SOM system flagged "14,000 items that the stores ordered across the chain that would have to be investigated" before they could be shipped. Walgreens admitted that yet again it did not have sufficient resources to timely review these orders. Walgreens noted that "[t]he DEA would view this as further failures of our internal processes, which could potentially result in additional pharmacies and distribution centers being subjected to regulatory actions and ultimately prohibited from handling controlled substances." At the time these 14,000 orders were flagged Walgreens Rx Integrity Team was comprised of fewer than five people. Even at its height, Rx Integrity had only eleven employees.    Instead of

sufficiently staffing the SOM program, Walgreens recognized it had the ability to control its due diligence workload by increasing the stores' ceiling levels, and thereby reducing the number of orders that would hit that ceiling and result in a flag.

169.    As described below, Walgreens admits to failures in its suspicious order monitoring prior to 2012.  Comparing the 2013 SOM system to the previous system, one of Walgreens's Pharmaceutical Integrity Managers in August 2013 explained:

> The Controlled Substances Order Monitoring system now in place sets limits for each item based on the chain average for that item for stores of similar size. If a particular store fills more of this item than normal and needs additional product we would need to document the reason and increase via a CSO Override .... The purpose for this is to ensure we have performed adequate review before sending in additional inventory.
>
> The previous system would continue to send additional product to the store without limit or review which made possible the runaway growth of dispensing of products like Oxycodone, that played a roll [sic] in the DEAs investigation of Walgreens.

170.    Yet, even in 2013, orders being flagged as suspicious for review before shipment were "a week old" before they made it to the review team, often "ha[d] already been shipped," and were not being reported.

171.    Walgreens never equipped its distribution operations to properly monitor for, report, and halt suspicious orders, or otherwise effectively prevent diversion.  When it became clear Walgreens would need to devote significant resources to achieve compliance, Walgreens chose instead to cease controlled substance distribution all together.  Walgreens stated that "while the financial impact of no longer . . . [self distributing] from the Walgreens DCs was taken into consideration, there is a greater risk to the company in fines and loss of licenses if we continue to sell these items in our warehouses."

172.     Although Walgreens purported to have in place "Good Faith Dispensing" ("GFD") Policies for many years, it failed to meaningfully apply policies and procedures, or to train employees in its retail pharmacies on identifying and reporting potential diversion.

173.     Despite knowing that prescribers could contribute to diversion, and having a separate and corresponding duty with respect to filling prescriptions, from at least 2006 through 2012, Walgreens's dispensing policies, which it titled "Good Faith Dispensing", or "GFD", explicitly instructed pharmacists who "receive[] a questionable prescription" or otherwise were "unable to dispense a prescription in good faith" to "contact the prescriber" and, if "confirm[ed]" as "valid" by the prescriber, to then "process the prescription as normal."   Further, though Walgreens's policies listed a handful of "questionable circumstances," such as "increased frequency of prescriptions for the same or similar controlled drugs by one prescriber[,] for large numbers of patients [,] for quantities beyond those normally prescribed," it is unclear what, if any, resources Walgreens made available to its pharmacists for checking these vague criteria, which, in any event, became meaningless if a prescriber "confirm[ed]" the prescription as "valid," by calling the prescriber.   For example, in 2010 when a pharmacy manager expressed concern about significant numbers of opioid prescriptions from pain clinics, and being help responsible for "excessive c2 rx dispensing," her district supervisor instructed her "not [to] refuse script for large quantities" but simply to "call the MD's, document it on the hard copy[,] and that is all that is needed to protect your license."   Despite internally recognizing that "a prescriber of a controlled substance prescription [may be] involved in diversion", Walgreens's GFD policies continued to endorse calling the doctor as a greenlight to any "questionable" prescription.

174.     In 2012, Walgreens finally removed the "process the prescription as normal" language from its formal GFD policies, admitting that under the law "it is not enough to get

confirmation that the prescriber wrote the prescription." However, Walgreens still failed to ensure it complied with its duties.

175.    Walgreens failed to adequately train its pharmacists and pharmacy technicians on how to prevent diversion, including what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when other suspicious circumstances are present, and failed to provide them the means of doing so. To be clear, this required no inquiry into whether an opioid prescription was the proper treatment for a particular patient; instead, as a registrant, Walgreens was obligated, and failed, to implement policies and procedures at a corporate level to identify and address signs of diversion.

176.    Indeed, during the course of a 2009 DEA investigation into Walgreens dispensing noncompliance, Walgreens internally noted that it currently had "no training" for employees dispensing controlled substances. Meanwhile, Walgreens corporate officers turned a blind eye to these abuses. In fact, a Walgreens corporate attorney suggested, in reviewing the legitimacy of prescriptions coming from Florida, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens's attitude that profit outweighed compliance with the law or protecting public health.

177.    Ultimately, in 2011, Walgreens and the DEA entered a Memorandum of Agreement regarding all "Walgreens . . . pharmacy locations registered with the DEA to dispense controlled substances," requiring Walgreens to implement significant nationwide controls lacking in its operations. Walgreen Co. was required to create a nationwide "compliance program to detect and prevent diversion of controlled substances *as required by the … (CSA) and applicable DEA regulations*." Pursuant to the MOA, the "program shall include procedures to identify the common

signs associated with the diversion of controlled substances including but not limited to, doctor-shopping and requests for early refills" as well as "routine and periodic training of all Walgreens walk-in, retail pharmacy employees responsible for dispensing controlled substances on the elements of the compliance program and their responsibilities under the CSA." Further, Walgreens was required to "implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized individuals pursuant to federal and state law and regulations."

178.    Walgreens would also make more promises in a 2013 Memorandum with the DEA, described further below, related to failures to that lead to the ISOs described above.

179.    Even after development and a relaunch of its GFD policy in response to settlements with the DEA, however, Denman Murray, Director of Rx Supply Chain Retail, stated in a deposition that, "traditionally, we've always treated a controlled substance like any other, [a] widget's a widget to the system."

180.    Further, after the June 2012 GFD "relaunch" in April 2014, a Walgreens "RxIntegrity" presentation focused on Walgreens "Market 25," but also assessing "average market" trends, reported that "pharmacists [were] not being too strict with GFD, nor [were] they losing volume."[9]

181.    As with distribution, Walgreens failed to allocate appropriate resources to dispensing compliance and supervision. Walgreens has approximately 26,000 pharmacists, each of whom may receive as many as 400-500 prescriptions a day. In 2013, however, Walgreens internally reported that its District Managers and Pharmacy Supervisors were "challenged to get

---

[9] Market 25 consisted of Indiana, Kentucky, and West Virginia. Similar results reported for Market 3, Florida.

into the stores" and in a 90-day period, more than a thousand stores did not receive a visit from the managers or supervisors. These supervisory personnel were assigned a "high number of stores" and their time was consumed with "people processes, business planning, market and district meetings," such that supervision in store was being handled informally by "community leaders" who have "limited formal authority."

182.    Even where Walgreens's policies recognized red flags, Walgreens failed to provide its pharmacists with effective tools for assessing them.  For example, Walgreens's policies and internal documents acknowledged that distance between the patient, pharmacists, and/or prescriber constituted a red flag, however, Walgreens did not even begin piloting an automated process for flagging such distances through common and long available technological solutions until the Spring of 2021.

183.    Walgreens knew its much touted good faith dispensing, or "GFD," policies were ineffective, and, in 2013, it launched a "Target Drug GFD" program to purportedly "put teeth around GFD for high risk products."  The policies required pharmacists to perform extra checks on red flags and to complete TD GFD checklists when presented with certain opioid prescriptions.

184.    However, the TDGFD procedures were largely window dressing.  Walgreens deliberately omitted hydrocodone from its TDGFD process, despite knowing in 2013 that HCPs were the most abused of all prescription opioids, and in 2019 was still considering whether to add hydrocodone, even though it had been a Schedule II opioid since 2014.  Walgreens further failed to make the TDGFD checklist an electronic form until 2020, despite knowing that doing so would make compliance and supervision more effective.  A review of Walgreens's TDGFD forms in certain jurisdictions reveals Walgreens failed to even complete a TDGFD form for as many as half of the prescriptions for which Walgreens's own policies stated such a form was required.

185.    A Walgreens internal audit performed after the 2013 DEA settlement confirms that Walgreens's supervision and compliance failures continued.  Among other failings, the audit team noted no formal monitoring program existed to confirm that pharmacies across the chain are complying with controlled substance documentation and retention requirements, no monitoring outside of the deficient "store walk program" existed to monitor target drug good faith dispensing requirements and no corporate reporting was being generated, and employees were failing to timely complete Good Faith Dispensing training, such that, at the time of the audit, over 35,000 employees had not completed their required training for that year.  Management's response largely was to seek to incorporate additional compliance measures into the store walk procedure.  However, documents from 2016 regarding monthly store compliance walks indicate that during the monthly "Compliance Walks" to "verify compliance … [with] regulatory requirements in… pharmacy areas," substantially no dispensing compliance supervision occurred, outside of ensuring the pharmacy was verifying the patient's address on five sample prescription fills.

186.    Compliance with GFD and TD GFD has been poor.  For example, in 2014 Walgreens discovered a pharmacist who failed to follow GFD for five to six months without being discovered by supervisors.  In 2014, Rx Integrity noted dozens of stores dispensing opioids without performing the required checks.  In certain cases, the pharmacists were unaware of the GFD procedures or had been told by supervisors to disregard them.

187.    In 2015, Walgreens performed a "business continuity" audit of a random sample of approximately 2,400 pharmacies to determine whether Walgreens was "compliant with the policies/procedures put in place" regarding dispensing pursuant to Walgreens's agreement with the DEA.  As the audit progressed, Walgreens internally noted "put your seatbelts on" because the audits were "not going great" and they would need to implement a "mitigation plan … to satisfy

55

the MOA" for the non-compliance revealed by the audit.  In Walgreens's own words, "Results were unfavorable."  Fewer than 60% of stores were complying with TD GFD with respect to filled prescriptions, 1,160 stores did not have a single refused prescription, and an additional 1,182 stores had refused fewer than 25 prescriptions total in a nine-month period.  Only 63 out of 2,400 pharmacies had refused 26 or more prescriptions during that same nine months in 2015.

188.    Walgreens's determination to bury evidence of noncompliance in the service of profit goals has continued.  When a Walgreens consultant interviewed Walgreens pharmacy employees, they drafted a report finding that employees "sometimes skirted or completely ignored" proper procedures to meet corporate metrics and committed "errors resulting from stress." The consultants reported that they "heard multiple reports of improper behavior" that was "largely attributed to the desire" to meet a corporate metric known as "promise time," which ensures that patients get prescriptions filled within a set amount of time.  Upon reviewing a draft of the report, senior leaders at Walgreens directed the consultants to remove some of the damaging findings, which the consultant company ultimately did, even though the consultant's employees stated requests to remove information from slides conflicted with their business ethics.  At around this same time, Walgreens award the consultant company a $1.5 billion contract.

189.    The "Big Three" wholesalers, Cardinal, McKesson, and AmerisourceBergen, gave deferential treatment to chain pharmacies. An internal Cardinal document for example, stresses that "certain chain pharmacies refuse to allow any sort of administrative inspection by Cardinal or to make certifications" and that large, national chains can "take their billions upon billions of dollars in business to any wholesaler in the country."

190.    Thus, for example, in 2008, Cardinal prepared talking points for a NACDS Conference about its planned retail chain SOM program, making it clear that the program would

"minimize the disruption" to retail chains and that they would "work together" with the pharmacies "to ensure that our Suspicious Order Monitoring program for retail chains does not interrupt" business. Cardinal also provided warnings to Defendants, including Walgreens, that they were approaching thresholds so that the chains could avoid triggering SOM reporting and adjust ordering patterns by, for example, delaying orders or, more often, obtaining a threshold increase. Such "early warnings" were so helpful to Walgreens that as of 2012 Walgreens adopted the concept for its own SOM system for self-distribution, noting internally that by "flagging the stores at 75%," it could "avoid cutting/reducing orders and subsequently not have to report a SOM to the DEA."

191.    Preferential treatment of Walgreens ultimately was not enough for Cardinal to keep Walgreens's business, however.  In 2013, Walgreens entered a ten-year agreement with AmerisourceBergen Drug Company.  The shift to AmerisourceBergen as its exclusive supplier prompted Cardinal to complain: "we bailed you guys out when you had your [DEA] issues."

192.    By 2017, Walgreens accounted for 30% of AmerisourceBergen's revenue. [10] AmerisourceBergen was similarly deferential, allowing Walgreens to "police their own orders and block any order to [AmerisourceBergen ("ABC")] that would exceed ABC's threshold thus triggering a suspicious order being sent to DEA from ABC. Additionally, when AmerisourceBergen received orders from Walgreens "outside the expected usage," Walgreens and AmerisourceBergen met to discuss adjusting thresholds or using "soft blocking." Contrary to DEA guidance and its own

---

[10] As a part of its distribution agreement, Walgreens gained purchase rights to AmerisourceBergen equity, allowing it to further participate in the prescription opioid shipment boom in America. Walgreens subsequently exercised these purchase rights, ultimately owning approximately 26% of AmerisourceBergen.  As part of the transaction, Walgreens has the ability to nominate up to two members of the Board of Directors of AmerisourceBergen.  Currently, Walgreen's Co-Chief Operating Officer sits on the AmerisourceBergen Board of Directors.

stated policy, AmerisourceBergen also shared the threshold limits set by its "order monitoring program" with Walgreens, and also provided Walgreens with weekly SOM statistics. AmerisourceBergen generally would not take action on Walgreens orders that exceeded its thresholds without first talking to Walgreens.

193.    Walgreens owns 26% of AmerisourceBergen's stock.  In 2018, after a coalition of AmerisourceBergen shareholders sought greater transparency from its Board related to the "financial and reputational risks associated with the opioid crisis," Walgreens, together with other insiders, reportedly leveraged this position to defeat the proposal, which enjoyed majority support among the independent shareholders.

194.    As described above and further below, as both a distributor and a dispenser, Walgreens ignored indicia of diversion in Connecticut.

195.    According to the data from the DEA's ARCOS database, between the years 2006 and 2014, Walgreens distributed 161,846,360 dosage units of oxycodone and hydrocodone to its pharmacies in Connecticut. The volume of opioids Walgreens brought into Connecticut and ultimately dispensed from its pharmacy locations was so high as to indicate to Walgreens that not all of the prescriptions distributed to and dispensed out of its Connecticut stores could be for legitimate medical uses.

196.    Walgreens violated the standard of care for a distributor by failing to:  (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

197.   The volume of opioids Walgreens shipped into, and dispensed from locations in, Plaintiffs' communities was so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.

198.   Yet, Walgreens did not make any suspicious order report of an order in Connecticut between 2007 and 2014.   Instead, Walgreens funneled far more opioids into Connecticut than could have been expected to serve legitimate medical use and ignored other indicia of suspicious orders.   This information, along with the information known only to distributors such as Walgreens (especially with its pharmacy dispensing data), would have alerted Walgreens to potential diversion of opioids.

199.   In addition, Walgreens also distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Connecticut and Plaintiffs' communities.   Walgreens failed to take meaningful action to stop this diversion despite its knowledge of it, and it contributed substantially to the opioid epidemic in Connecticut and Plaintiffs' communities.

200.   Walgreens also developed and maintained highly advanced data collection and analytical systems.   These sophisticated software systems monitor the inventory and ordering needs of customers in real-time and depicted the exact amounts of pills, pill type, and anticipated order threshold for its own stores.

201.   Through this proprietary data, Walgreens had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in Connecticut, including in the Plaintiffs' communities.   It used this data to evaluate its own sales activities and workforce.   Walgreens also was in possession of extensive data regarding individual doctors' prescribing and dispensing to its customers, the percentage of a prescriber's prescriptions that were

controlled substances, individual prescription activity across all Walgreens stores, and the percentages of prescriptions purchased in cash. Such data are a valuable resource that Walgreens could have used to help stop diversion, but it did not.

202.    Walgreens, by virtue of its data analytics, was actually aware at a corporate level of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails," known for their abuse potential, such as oxycodone and Xanax; (3) individuals who arrived together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area. However, Walgreens failed to effectively make the data demonstrating these obvious flags available to its pharmacists and failed to properly address the red flag dispensing patterns.

203.    Walgreens also failed to adequately use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts or doses of opioids, or to adequately use data available to it to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis. While Walgreens periodically implemented programs that would identify the most suspicious prescribers, it failed to make this data readily available to its pharmacists, and either terminated or failed to act on them at the corporate level.

204.    Walgreens failed to adequately analyze and address its opioid sales relative to: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

205.     At the store level, Walgreens did not make any controlled substance metrics available to pharmacists for specific prescribers. Further, despite the fact that at the corporate level Walgreens utilized many tools, including IMS, for descriptive statistics around prescriber patterns, Walgreens was not aware of any consistent reports written using that data.  Instead, when a pharmacist or Walgreens team member had a concern about a particular prescriber ad hoc prescriber profiles were pulled.  However, these reports were difficult to interpret so corporate would have to assist with the analysis and interpretation of the reports.

206.     Walgreens ran reports known as "GFD Opportunities reports," generated from data on its individual pharmacies and pharmacists.  A "GFD Opportunities" tool included information such as "Cash rank, Oxycodone IR rank, "target" drug quantity rank, and target drug rate rank.  With the information available to it, Walgreens thus knew which pharmacists filled more controlled substances prescriptions that others, however, Walgreens failed to meaningfully act to curtail red flag dispensing.

207.     Walgreens knew or should have known that its pharmacies in Connecticut, and the surrounding area, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  Also, the volumes of opioids distributed

to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets. Walgreens had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

208. Walgreens admits its role in the opioid epidemic, stating it has the "ability – and [] critical responsibility – to fight the opioid crisis" as the "nation's largest pharmacy chain" in a time when "[a]ddiction to prescription painkillers, heroin, and other opioids has surged, with opioid overdoses quadrupling in this decade" and "drug overdose deaths – the majority from prescription and illicit opioids" resulting in "more fatalities than from motor vehicle crashes and gun homicides combined." Walgreens also admits the "opioid crisis" is caused by "misuse, abuse and addiction" that result from the "flow of opioids that fuel the epidemic."

### 3. Walmart Failed to Provide Effective Controls against Diversion

209. During most of the time period relevant to Plaintiff's claims, Walmart acted as both a distributor of controlled substances to its own Walmart pharmacies and a retailer dispensing controlled substances at Walmart pharmacies and Sam's Club pharmacies. While operating under different brand names, both Walmart and Sam's Club pharmacies were subject to the same flawed policies, lack of oversight, and inadequate implementation emanating from Walmart's Home Office. In both its capacity as a distributor and as a dispenser of controlled substances, Walmart failed to implement effective policies and practices to prevent diversion of opioids in and around Plaintiff's community. By the time Walmart implemented a system for monitoring suspicious orders or policies allowing corporate blocks of known pill mill doctors, the opioid epidemic had already claimed hundreds of thousands of American lives.

210.     Walmart is the largest private employer in the United States, employing over 1.5 million people. But for years, Walmart chose not to assign a single employee to design or operate a system to detect suspicious orders of controlled substances. Despite Walmart's obligations as a distributor of controlled substances, it was not until 2014 that Walmart began to take any meaningful steps toward developing a system for monitoring suspicious orders.

211.     Walmart operated registered distribution centers to supply its own pharmacies with controlled substances from the early 2000s until 2018.

212.     Prior to 2011, Walmart did not have any written policy or procedure in place to monitor orders of controlled substances shipped by its pharmacy distribution centers.

213.     In the absence of an established policy or procedure, Walmart relied on its hourly employees and associates filling orders at the distribution centers to subjectively monitor the orders they were filling for anything unusual. These associates were responsible for filling and reviewing several hundred orders a day.

214.     Walmart did not provide any guidance or training to its associates as to what constitutes a suspicious order or how to evaluate an order for unusual size, frequency, or pattern.

215.     No Walmart employee ever flagged an order as suspicious prior to 2011.

216.     Although Walmart did create a procedure for identifying suspicious orders of controlled substances beginning in 2011, this procedure was insufficient to identify suspicious orders of controlled substances. Walmart's program flagged only very large orders of controlled substances. Specifically, it flagged weekly orders for controlled substances of 50 bottles (5,000 dosage units) or more and orders for more than 20 bottles (2,000 dosage units) that were 30% higher than a rolling four-week average for that item. Orders under 2,000 dosage units per week were never flagged, meaning that a pharmacy could order 8,000 dosage units per month without

63

ever being flagged. Moreover, that meant that even if an order was more than 30% greater than the four-week average, it could not draw an alert unless it also was more than 20 bottles.

217.     Under this system, an alert did not mean Walmart would report the order to the DEA or halt it pending necessary due diligence. To the contrary, Walmart never reported an order flagged by its monitoring program to the DEA as suspicious. Rather than halting flagged orders, Walmart simply cut the order to the amount of the 50-bottle threshold and shipped it. Walmart never reported cut orders to the DEA. Although the distribution centers sent information regarding flagged orders daily to Walmart's corporate headquarters in Arkansas (the "Home Office"), no system existed for follow-up on flagged orders by employees at the Home Office.

218.     In mid-2012, Walmart implemented a "hard limit" on orders of a single opioid product, 30 mg oxycodone ("Oxy 30"). Under this approach, an order for over twenty bottles of Oxy 30 was automatically reduced to twenty bottles. Walmart would not report these excessive orders of Oxy 30 to the DEA.

219.     At the same time, Walmart's distribution center began generating a daily report of all the pharmacies placing orders for over twenty bottles of various oxycodone medications, although Walmart did not place a "hard limit" on any dosage strength or product other than Oxy 30. This report, called the "Over 20 Report" later included other controlled substances as well. Although the report was generated and circulated on a daily basis, Walmart did not have an adequate system in place to review and follow up on these excessive orders beyond investigating for indicators of internal theft, and it did not have a system in place to address stores that repeatedly appeared on the Over 20 Report. Regardless of having been identified on the Over 20 Report, these orders were filled and shipped. There is no evidence of any order in fact being held or halted pursuant to this practice.

220.     Even if Walmart's distribution center reduced an order to a smaller number of bottles, nothing prevented a Walmart or Sam's Club pharmacy from making up the difference by ordering opioids from an outside distributor, such as McKesson and AmerisourceBergen. Not only could Walmart pharmacies place another order with these outside vendors to make up the difference, they could have orders fulfilled by both Walmart and a third-party distributor at the same time. Even though Walmart had the ability to monitor orders to outside vendors for suspicious orders, it did not, which allowed Walmart pharmacies to exceed the already high thresholds simply by ordering drugs from a third party.

221.     Walmart knew that these policies and procedures were insufficient to fulfill its obligations to prevent diversion of controlled substances. For example, in 2013, Walmart acknowledged in an internal presentation that it had not yet designed a compliant system for suspicious order identification, monitoring, and reporting. It also stated that it was "TBD" when Walmart would develop such a system. In 2014, Walmart acknowledged that it still lacked a compliant monitoring program and that it had "no process in place" to comply with government regulations and that this created the "severe" risk of "financial or reputational impact to the company." At that point, Walmart still had no written policies and procedures required orders of interest to be held and investigated.

222.     In 2015, Walmart "enhanced" its suspicious order monitoring policy by implementing store-specific thresholds. It based these thresholds on the standard deviation of a specific pharmacy's order history for each controlled substance. The thresholds also included minimum amounts, below which no orders were flagged under any circumstance, regardless of pattern or frequency.

223.    For almost all Walmart pharmacies, this minimum was set at 2,000 dosage units per week (or 8,000 dosage units per month). An order under this minimum threshold would not be flagged regardless of changes in ordering patterns. A pharmacy could, for example, go from ordering 10 dosage units of Oxycodone 10 mg per month to 7,999 per month without any order being flagged or reviewed. Thus, even Walmart's "enhanced" order monitoring program failed to provide effective controls against diversion.

224.    According to the data from the DEA's ARCOS database, between the years 2006 and 2014, Walmart distributed 24,325,870 dosage units of oxycodone and hydrocodone to its pharmacies in Connecticut. The volume of opioids Walmart brought into Connecticut and ultimately dispensed from its pharmacy locations was so high as to indicate to Walmart that not all of the prescriptions distributed to and dispensed out of its Connecticut stores could be for legitimate medical uses.

225.    Yet, Walmart did not report a single suspicious order in the County between 2007 and 2014. Instead, Walmart funneled far more opioids into Connecticut than could have been expected to serve legitimate medical use, and ignored other red flags of suspicious orders. This information, along with the information known only to distributors such as Walmart (especially with its pharmacy dispensing data), would have alerted Walmart to potential diversion of opioids.

226.    In addition, Walmart, also distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Connecticut and Plaintiffs communities. Walmart failed to take meaningful action to stop this diversion despite its knowledge of it, and it contributed substantially to the opioid epidemic in Connecticut and Plaintiffs' communities.

227.    Walmart violated the standard of care for a distributor by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

228.    Walmart had the ability to detect diversion in ways third-party wholesale distributors could not by examining the dispensing data from their own retail pharmacy locations.

229.    Given the volume and pattern of opioids distributed in Connecticut and in Plaintiffs' communities, Walmart knew or should have known that opioids were being oversupplied and should have detected, reported, and rejected suspicious orders, but it failed to do so.

230.    Walmart, by virtue of the dispensing data available to it, had actual knowledge of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails" known for their abuse potential, such as oxycodone and Xanax; (3) individuals arriving together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area. However, Walmart ignored these red flags.

231.    Walmart, therefore, was aware of the suspicious orders that flowed from its distribution facilities. Walmart refused to identify, investigate, and report suspicious order despite its actual knowledge of drug diversion. Rather, Walmart failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into Connecticut.

232.    Walmart failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

233.    Walmart was, or should have been, fully aware that the opioids being distributed and dispensed by it were likely to be diverted; yet, it did not take meaningful action to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

234.    Given Walmart's retail pharmacy operations, in addition to its role as a wholesale distributor, Walmart knew or reasonably should have known about the disproportionate flow of opioids into Connecticut and Plaintiffs' communities and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, diversion.

235.    Walmart set policies for its pharmacies at the corporate level. Walmart also presented, through nationwide advertising, a public image of the safety and excellence of all the pharmacists the company hired. In a recruitment video for pharmacists on Walmart's YouTube channel, the company shows Walmart pharmacists speaking about working at the company: "the safety and the excellence we carry to our patients is phenomenal," adding that "the culture that our company has [is] respect for the individual, service, and excellence, and, of course, we always have integrity."[11] The commercial also states that Walmart's pharmacists "strive for excellence" and are "passionate about providing quality healthcare."[12]

236.    Walmart pharmacies in and around Connecticut and Plaintiffs' communities received distributions of prescriptions from Walmart's distribution centers and from other

---

[11] Walmart, *Your Career as a Walmart Pharmacist* (Sept. 25, 2014), available at https://www.youtube.com/watch?v=9VD12JXOzfs (last visited May 13, 2020).

[12] *Id.*

wholesale distributors, which enabled these pharmacies to have the same orders filled by both Walmart and a third-party distributor.

237.    The volume of prescription opioids dispensed by Walmart pharmacies in and around Connecticut and Plaintiffs' communities is indicative of potential diversion and required appropriate due diligence.

238.    Walmart had unique insight into all distribution and dispensing level data, and knew or should have known that it was dispensing an excessive volume of pills into Connecticut and Plaintiffs' communities.

239.    Walmart knew or should have known that its pharmacies in and around Connecticut and Plaintiffs' communities were: (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. Also, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to noncontrolled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets. Walmart had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

240.     Walmart had complete access to all prescription opioid distribution data related to Walmart pharmacies in and around Connecticut and Plaintiffs' communities.

241.     Walmart had complete access to all prescription opioid dispensing data related to Walmart pharmacies in and around Connecticut and Plaintiffs' communities.

242.     Walmart had complete access to information revealing the doctors who prescribe the opioids dispensed in Walmart pharmacies Connecticut and Plaintiffs' communities.

243.     Walmart had complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in Walmart pharmacies in and around Connecticut and Plaintiffs' communities.

244.     Walmart had complete access to information revealing the opioids prescriptions dispensed by Walmart pharmacies in and around Connecticut and Plaintiffs' communities.

245.     Walmart had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by Walmart pharmacies in and around Connecticut and Plaintiffs' communities.

246.     Walmart had complete access to information revealing the size and frequency of prescriptions written by specific doctors across Walmart pharmacies in and around Connecticut and Plaintiffs' communities.

247.     Walmart did not begin to use the foregoing information to identify prescribers of concern or signs of diversion until 2017.

248.     Walmart failed to put in place effective policies and procedures for the identification of red flags when dispensing opioids and failed to provide adequate guidance or training to its pharmacists on identification of red flags.

249.     Even when Walmart pharmacists suspected that an individual prescriber was consistently writing prescriptions for other than a legitimate medical purpose, they could not, for most of the relevant time period, use a "blanket" refusal to fill to refuse all prescriptions from that prescriber. Instead, Walmart pharmacists were required to evaluate and refuse to fill prescriptions on a case-by-case basis. A 2011 document from Walmart Regulatory Affairs regarding the "Proper Prescriber-Patient Relationship" stated, "Blanket refusals of prescriptions are not allowed. A pharmacist must make an individual assessment of each prescription and determine that it was not issued based on a valid prescriber-patient relationship or a valid medical reason before refusing to fill." The prescription-by-prescription refusal to fill procedure was time-consuming and placed the burden on Walmart and Sam's Club pharmacists, who were already under pressure to fill prescriptions quickly. Moreover, many red flags for diversion are based on prescribing patterns that are readily apparent from aggregate data—for example, the percentage of controlled substance prescriptions compared to non-controlled substances written by a prescriber—but not apparent based on an individual prescription.

250.     Finally, in 2017, Walmart implemented a policy by which individual pharmacists could request blanket refusals, which would permit the pharmacist to refuse to fill future prescriptions from that prescriber without evaluating each prescription individually. Walmart always had the ability to "centrally block" problematic prescribers across all Walmart and Sam's Club pharmacies, but it did not establish a procedure to do so until 2017.

251.     In the "Practice Compliance" document describing this policy, Walmart recognized that its Home Office may, "in certain situations," have information about prescribing practices that is not available to individual pharmacists:

> While pharmacists are in the best position to determine whether individual prescriptions are appropriate, *additional information may*

> *be obtained that is not available to our pharmacists.* Therefore, in
> certain situations, a prescriber may be identified whose prescribing
> practices raise concerns about prescribing controlled substances for
> legitimate medical purposes. After a thorough review, these
> additional insights may lead Walmart to place a block in Connexus
> on controlled substance prescriptions from these prescribers.

252.    As was true at Walgreens, Walmart's "fill, fill, fill" culture prevented pharmacists

from consistently resolving red flags before dispensing prescriptions. Incentive awards were tied

to the number of prescriptions a pharmacy filled and profit that the pharmacy generated. Controlled

substances were included in Walmart's pharmacy incentive program for most of the relevant time

period. In addition, pharmacists were under constant pressure to increase the number of

prescriptions they filled, and to increase the overall percentage of pharmacy sales. As a result,

because of Walmart's drive for speed, pharmacists often did not have enough time to sufficiently

review a prescription and conduct the appropriate due diligence.

253.    These systemic deficiencies are reflected in numerous enforcement actions and

investigations that demonstrate the Walmart put profits and sales ahead of compliance, its

customers, the communities in which they do business, and public safety. In 2009, for example,

the DEA issued a Show Cause order seeking to revoke the registration of a Walmart pharmacy in

California. The order alleged that the pharmacy:

> (1) improperly dispensed controlled substances to individuals based
> on purported prescriptions issued by physicians who were not
> licensed to practice medicine in California; (2) dispensed controlled
> substances . . . based on Internet prescriptions issued by physicians
> for other than a legitimate medical purpose and/or outside the usual
> course of professional practice . . . ; and (3) dispensed controlled
> substances to individuals that [the pharmacy] knew or should have
> known were diverting the controlled substances.

254.    In addition, a 2011 Memorandum of Agreement ("2011 MOA") arising out of the

investigation states that the DEA also learned that the same pharmacy was allegedly dispensing

controlled substances based on prescriptions that lacked valid DEA numbers and allegedly refilling controlled-substances prescriptions too early.

255.    The failures described in the 2011 MOA were not limited to California but reflected systemic failures at the corporate level. Indeed, the 2011 MOA, which required Walmart to maintain a "compliance program" states that it is applicable to "all current and future Walmart Pharmacy locations."

256.    Following the 2011 MOA, Walmart was supposed to revamp its dispensing compliance program, but still, its policies and procedures remained deficient.

257.    Instead, systemic failures continued, and Walmart's national corporate office not only failed to insist that Walmart implement adequate controls against diversion, they ignored concerns raised by Walmart pharmacists.

258.    One internal document from 2015, for example, notes concerns from a Walmart pharmacist that "his leadership would not support his refusing to fill any 'legitimate' (written by a Dr) prescriptions and he stated that his current volume/staffing structure doesn't allow time for individual evaluation of prescriptions[.]" When this pharmacist refused to fill a customer's controlled substance prescription because the customer was attempting to fill it too soon, the Market Health & Wellness Director for that store complained to management that the pharmacist "sent a customer to a competitor" and "expressed significant concern about how 'sending customers away' would impact the sales figures for the store," and insisted that "the store needs to fill every available prescription.

259.    In December 2020, the U.S. Department of Justice ("DOJ") filed a lawsuit against Walmart over its opioid dispensing and distribution practices. *United States of America v. Walmart Inc. et al.*, No. 1:20-cv-01744, ECF No. 1 (D. Del. December 22, 2020) ("DOJ Compl."). After a

multi-year investigation, and based on a review of millions of pages of documents, much of which was produced in the MDL, the DOJ alleged that Walmart pharmacists filled prescriptions issued by "known pill-mill prescribers" and filled "numerous prescriptions that, on their face, showed such obvious red flags . . . that Walmart pharmacists would have known that the prescriptions had a very high probability of being invalid," in addition to Walmart having a "grossly inadequate suspicious-order monitoring program." *Id.* ¶¶ 22-23, 35. Pharmacists or pharmacy managers would contact Walmart's central compliance personnel for guidance on handling suspected pill mill doctors but felt that their "concerns are falling upon deaf ears." *Id.* ¶ 237. Pharmacists repeatedly sought help from Walmart's corporate office, to no avail. Walmart compliance officials failed to take action in response to these alarms. Instead, they repeatedly sent the same boilerplate response, stating that pharmacists must use their professional judgment but that they must continue to evaluate and refuse to fill on an individual, prescription-by-prescription basis, even in situations where other retail pharmacies had stopped filling any prescriptions from particular prescribers. As a result, Walmart and Sam's Club pharmacies often became channels for illegitimate controlled substance prescriptions from known pill mills. Even in circumstances where a prescriber was under investigation by the DEA, Walmart's compliance department informed pharmacists that would not be a reason to refuse to fill that prescriber's controlled substance prescriptions.

260.    The practice of filling prescriptions suspected of being illegitimate, including prescriptions for large quantities of opioids and prescriptions for known "drug cocktails" frequently diverted and abused, was not limited to handful of Walmart and Sam's Club pharmacies. Rather, Walmart had a systemic, national problem. Walmart pharmacists from across the country, including Maine, Massachusetts, Kansas, Washington, Texas, and North Carolina, contacted Walmart's national compliance directors about problem prescribers and suspect

prescriptions. One Walmart pharmacist in North Carolina wrote to a Market Health and Wellness Director, in an email subsequently sent to the national compliance department, that "there is no way that many 25 year olds need 120 to 240 oxycodone per month." DOJ Compl. ¶ 324. Regarding one Texas doctor who was later convicted of illegal distribution of opioids, a Walmart pharmacy manager wrote; "Other chains are refusing to fill for him which makes our burden even greater. *Please help us.*" *Id.* ¶174 (emphasis added). Another described the same doctor as a "risk that keeps [him] up at night." *Id.* ¶ 236. Similarly, in September 2016, a Walmart pharmacy manager in Pennsylvania advised that a doctor was "under investigation by the DEA for what we believe is a pill mill operation," and that Rite Aid had begun refusing to fill his prescriptions. *Id.* 296. The pharmacy manager requested that Walmart put in place a similar "blanket denial," but Walmart's compliance department responded that all prescriptions from that doctor must be evaluated individually. Id. Before this particular doctor was indicted in 2017 on nineteen counts including unlawful distribution and dispensing of controlled substances and violations of federal drug laws resulting in the death of five patients, Walmart pharmacies dispensed over 8,000 of his controlled substance prescriptions. *Id.* ¶ 297.

261.    Walmart also failed to adequately use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts or doses of opioids, or to adequately use data available to it to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

262.    Walmart also failed to adequately analyze and address its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if it conducted such reviews, it failed to take any meaningful action as a result.

### 4.   CVS Failed to Provide Effective Controls against Diversion

263.     CVS distribution centers, in tandem with outside wholesalers, such as Cardinal and McKesson, supplied opioids to CVS pharmacy stores until October 2014.  CVS self-distributed hydrocodone and hydrocodone combination products and cocktail drugs to its own stores, of which CVS had approximately 6,000 by 2006 and 9,700 by 2014.  Hydrocodone combination products (HCPs) were previously classified as Schedule III controlled substances, but rescheduled to Schedule II status on or about October 6, 2014.  CVS ceased self-distributing hydrocodone and HCPs the same day the rescheduling took effect but continued to distribute controlled substances including cocktail drugs to its CVS pharmacies.

264.     CVS pharmacies nationwide placed orders with CVS distribution centers through CVS's central mainframe computer ordering system.

265.     Before 2009, CVS, which stocked and sold opioids at more than 9,000 stores across the country, lacked any meaningful suspicious order monitoring ("SOM") system.  Instead, CVS relied on the gut instincts of pickers and packers of the drugs in the distribution center—workers responsible for pulling items off distribution shelves for delivery to pharmacy stores—to identify "really big" orders that they believed were simply too large.  This was not an effective SOM system.

266.     CVS lacked a training program to train its pickers and packers how to identify unusual orders of size, frequency, or pattern. CVS also did not have any written policies, procedures, or protocols with respect to the pickers' and packers' obligations until August 2013, and, there were no formal job requirements to be employed as a picker and packer.

267.     In 2007, with the help of an outside consultant, CVS began work on a Standard Operating Procedure ("SOP") Manual that was intended to cover all facets of DEA controlled substances compliance, including suspicious order monitoring.  However, by the summer of 2010,

neither the final manual nor the SOM section was complete. Internal documents from that time acknowledge that CVS was "still in the process of writing the suspicious order monitoring section of this standard operating procedure." In fact, at that time, the section of the draft manual dealing with SOPs for SOM states **"BEING DEVELOPED AND WRITTEN."**

268.     Drafts of the SOP Manual, meanwhile, show CVS knew, or should have known, that this was unacceptable. The draft manual provides that: "CVS is responsible for ensuring compliance with DEA regulatory requirements, and that responsibility cannot be abdicated or transferred to anyone else." Despite this acknowledgement, when the first version of the SOP Manual was issued in December 2007 and for multiple revisions thereafter, the SOM section still remained incomplete. It was not completed until August of 2010.

269.     Completion of the SOM section of the manual in 2010 did not equate to compliance, however.

270.     As John Mortelliti, CVS's Director of Loss Prevention, wrote in November 2009, this had become "a big issue with CVS and the DEA," and he was "trying to get a rough draft SOM SOP" before a DEA meeting. CVS only incorporated the final missing SOM section because of the need to fulfill an apparent promise to provide it to the DEA.

271.     CVS's Indiana distribution center was audited and investigated by the DEA for its distribution practices on August 24, 2010. The distribution center was responsible for portions of the relevant period for identifying and performing due diligence on nationwide orders that flagged on an Item Review Report ("IRR"). The day after the DEA's audit of CVS's distribution practices began, CVS sent a new SOP, which included for the very first time a policy on SOM. CVS internally posted the SOP at 1:35 pm on August 26, 2010. The document was hastily put together.

272.     On September 1, 2010, John Mortelliti sent an e-mail to Terrance Dugger who was present during the DEA audit. The "Subject" of the e-mail and the attachment is "DEA Speaking Points," and its "Importance" was listed as "high."  He writes: "Terrence, This is for the DEA. The corrections listed below have been updated.  It is ok to review this with the agents."

273.     Mr. Mortelliti then sent the same presentation on the same day to another group of CVS employees writing: "These are the final approved speaking points for the DEA agents if they come to one of your facilities and question suspicious monitoring.  It is ok to share this document. Please be sure your team understands it before presenting so it **doesn't look like a prop instead of a tool.**"  The presentation sent by Mr. Mortelliti to be shared with the DEA was not correct and was not the procedure being used by CVS.

274.     In a September 2010 e-mail, Mr. Mortelliti circulated an August 27, 2010 document titled "Suspicious Order Monitoring for PSE/Control Drugs: Summary of Key Concepts & Procedures," which he described as "final approved speaking points for the DEA" should DEA agents question suspicious order monitoring at a CVS facility.  In the correspondence, he asked that the recipients "be sure [their team] understands [the material] before presenting so it doesn't look like a prop instead of a tool."

275.     CVS had a "CVS DEA compliance coordinator" in name only.  A CVS employee who held the position from 2008 to 2014 said that her title was only "for reference in SOPs," not her real job.  For "personnel purposes," she was never considered the CVS DEA compliance coordinator.  Moreover, she had nothing to do with suspicious order monitoring, other than "updating the SOP with what was provided for the program."  This is according to CVS's "DEA Compliance Coordinator."

276.    CVS claims that in 2009 it began using a computer algorithm that flagged potentially suspicious orders needing additional investigation. The automated program was delivered by an outside vendor to CVS in December of 2008. CVS called the output of the flagged orders an Item Review Report ("IRR").

277.    The SOM algorithm delivered in December of 2008 was designed to "pend" (or identify) an order with a score of 0.15 or higher as potentially suspicious. The higher the score the more likely the order was potentially suspicious. In July, 2009 CVS reported to the algorithm designer that the SOM model was pending a large number of orders that CVS believed were "not suspicious on their face" and it requested that the model be changed. As a result, revised coefficients for the algorithm were delivered to CVS on August 27, 2009, and the pend score of .15 remained the same. Between June, 2010 and August, 2010, Mortelliti adjusted the IRR pend score from .15 to .65. The higher the score, the less sensitive the model, flagging fewer potentially suspicious orders for investigation. On February 8, 2011, the algorithm designer delivered a completely retuned SOM algorithm with another set of coefficients. The February, 2011 changes returned the pend score to .15. CVS again changed the pend score to .65.

278.    IRRs were the primary SOM process. A CVS corporate representative explained, on behalf of the company, "for the most part," if an order was not flagged as suspicious under the IRR system, there would be no due diligence of that order. Yet, CVS neglected to provide written instructions to its employees for how to perform that critical review until February 29, 2012.

279.    CVS's IRR system was deficient and failed in many respects to meet CVS's obligations as a distributor.

280.    CVS also learned in 2010 that its SOM algorithm was not working properly because it monitored by drug, not active ingredient, meaning that changes in a drug's description

or name caused historical data to be lost. Thus, the system was unable to determine that orders for these drugs exceeded or diverged from prior volumes or patterns.

281.    CVS's SOM algorithm also failed to consider outside vendor orders. In other words, CVS's SOM system would not track how many opioids CVS was ordering from third-party distributors such as Cardinal when evaluating whether to distribute opioids to one of its pharmacies. CVS knew this was a problem, as a "[s]tore may order a little from both the OV [outside vendor] and DC [CVS distribution center] to stay under the radar." It also knew that excluding outside vendor data meant CVS "may ship a potentially reportable suspicious order from [its] DC." Stores, including one that had a "68,000 hydrocodone pill loss," could also place telephone orders to outside vendors, into which there was "no visibility . . . until a later time." This deficiency is particularly glaring because, at a corporate level, CVS had full access to the orders its pharmacies placed to outside vendors.

282.    Acknowledging the ineffectiveness and deficiencies within its SOM system, CVS hired new consultants in 2012 to troubleshoot its existing SOM systems for the purpose of either fixing the deficient system or developing a new SOM system so as to attempt to become compliant with the law.

283.    Still, as late as July 2013, internal e-mail reflects that CVS's primary tool for investigating suspicious orders relied on data that was months or even years old and made any analysis, "for the most part, irrelevant and pointless."

284.    Not until mid to late 2014 did CVS fully implement a new SOM system. Even then, CVS encountered problems in evaluating suspicious orders for opioids and its SOMS was entirely lacking. The deployment was further delayed due to system data feed issues that created inaccuracies in the SOM historical data. A risk analysis of the new system was conducted in June

80

2014. The risk level was determined to be high for the SOM system in the following categories covering seemingly every aspect of its operation:

> inconsistent due diligence in SOM analysts reaching out to stores to investigate suspicious orders;

> inconsistency in documenting due diligence investigations of suspicious orders;

> lack of engagement by the Management Team;

> lack of communication between the SOM Management Team and SOM Analysts;

> lack of resources to handle the rollout of the new SOM system to all distribution centers; and

> lack of clarity in how the new SOM system is identifying suspicious orders.

285.    The foregoing categories are the key components of a compliant and effective SOM system. That same year, CVS stopped distributing opioids at the wholesale level, but it did continue to distribute cocktail drugs.

286.    Meanwhile, on August 5, 2013 the DEA began another audit and investigation of the CVS distribution center in Indiana. CVS's own documents acknowledge that the DEA's investigation was focused on its failure to maintain a SOM program for controlled substances.

287.    In response to queries from the DEA, CVS wrote a letter to the DEA revealing that it had only stopped seven suspicious orders across the entire country. Right before sending the letter, the author, Mark Nicastro, head of the CVS distribution center in Indiana, conceded internally that "I wish I had more stopped orders that went back further." Sadly, while Mr. Nicastro was writing the letter on CVS's behalf to the DEA, he could not even locate the SOP for the SOM, writing to Pam Hinkle, "For the life of me I can't find the SOP for SOM.  Can you send me an electronic copy please?  I have been on the logistics website, looked through hundreds of e-mails,

81

nothing. I'm surprised it is not on the website." Ms. Hinkle, Sr. Manager for Logistics, Quality and Compliance for CVS, responded that she too is unsure of the final version of the SOP SOM. CVS then sent the wrong version of the SOP SOM to the DEA.

288.    In May of 2014, CVS had a closing meeting with the DEA related to the distribution center audit. According to handwritten notes from a CVS employee who attended the meeting, the "most serious" violation is "failure to design" a SOM system. An internal CVS e-mail summarizing the meeting made a similar statement: DEA determined that CVS "faile[d] to maintain an [sic] SOM program." The head of CVS's distribution center in Indiana described Betsy Ferguson's, CVS's in-house counsel, confrontation with the DEA during the meeting, writing: "Dan [DEA Agent] finally pushed Betsy's button and the gloves came off. . . . Betsy made it very clear that a letter of admonishment was one thing. Anything other than that and she wanted an opportunity to do a presentation to his boss and her boss about what we do with SOM. Anything more than a letter and we would meet in D.C. in courts just like Walgreens did."

289.    The DEA issued its closing letter concluding that CVS failed to design and maintain a system to detect and report suspicious orders.

290.    All orders that appeared on the IRR required a thorough due diligence investigation, but only a very small percentage were subjected to appropriate due diligence. From early/mid-2009 through early 2011, one employee, John Mortelliti, the Director of Loss Prevention, "was taking the first pass through the IRR himself." According to CVS's corporate witness, "Mr. Mortelliti's practice would have been to review the report on a daily basis and determine whether items on the report warranted further review and due diligence and conduct review and due diligence as he deemed appropriate." At select times in 2013, CVS had only one full-time employee in the position of "SOM analyst" reviewing all potentially suspicious orders

for every pharmacy in the country. The SOM system would identify orders as potentially suspicious based on a number of factors and "pend" the order. Even though the orders had been identified as potentially suspicious, the CVS SOM analysts would conduct an "in depth" dive only on select orders. In fact, even though the SOM program could identify as many as 1,000 suspicious orders a day, the CVS employee would only do a "deep dive" on one to six orders per day.

291.    Even as late as 2012, CVS's SOM policy was clearly little more than window dressing. For example, CVS's SOM policy specified that if multiple orders for the same store are flagged during the same month, all orders after the first order will *not* be investigated and will be ***automatically released*** based on the release of the first order.

292.    As noted above, as of November 21, 2013, CVS had only reported seven suspicious orders to the DEA across all of its distribution centers and pharmacies in the entire United States. The first suspicious order CVS ever reported was not until February 29, 2012. CVS reported no suspicious orders in Connecticut

293.    CVS's collaboration with distributors went from lobbying to actually preventing adequate due diligence investigations of suspicious opioid orders. CVS knew that Cardinal and McKesson have independent due diligence obligations under the CSA to monitor all sales of controlled substances for orders which deviate in size, pattern or frequency. CVS understood that, to do so effectively, Cardinal and McKesson would require access to its dispensing information. CVS did not provide dispensing information to Cardinal or McKesson. In an email from Paul Farley to Michael Mone, both Cardinal employees, Farley wrote, "I spoke with Brian Whalen at CVS a couple of times this morning… They will not provide the doctor or patient information you requested unless it is requested by the DEA. He was quite adamant about this." CVS prevented Cardinal and McKesson from obtaining access to critical dispensing information for its pharmacies

to enable Cardinal and McKesson to conduct adequate due diligence of CVS's pharmacies.  Prior to 2013, Cardinal and McKesson did not investigate CVS by calling its pharmacists or visiting CVS stores, something they did with other pharmacies. Instead, distributors were instructed to contact CVS's loss prevention offices at corporate headquarters to inquire about suspicious orders, ensuring that any investigation into CVS ordering of opioids was conducted by CVS alone. As a result, CVS controlled all "due diligence investigations" of its opioid orders.

294.    CVS also prevented Cardinal from independently determining the appropriate order thresholds for opioids at CVS stores. CVS contractually protected its right to establish and change its threshold requirement for Schedule II controlled substances with Cardinal. The agreement expressly states that CVS has the discretion under the contract to set its threshold quantities for controlled substances at any level CVS deems appropriate.

295.    According to the data from the ARCOS database, between 2006 and 2014, CVS distributed 284,872,450 dosage units of hydrocodone to its pharmacies in Connecticut. The volume of opioids CVS brought into Connecticut and ultimately dispensed from its pharmacy locations was so high as to indicate to CVS that not all of the prescriptions distributed to and dispensed out of its Connecticut stores could be for legitimate medical uses.

296.    As a distributor and dispenser of prescription opioids, CVS knew or should have known that an excessive volume of pills was being sold into Connecticut, and some of those pills were necessarily being diverted.

297.    CVS violated the standard of care for a distributor by failing to:  (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

298.     The sheer volume of prescription opioids distributed to and dispensed by CVS pharmacies in and around Connecticut was indicative of potential diversion and required appropriate due diligence.

299.     CVS funneled far more opioids into Connecticut, and out of its pharmacy doors, than could have been expected to serve legitimate medical use, and it ignored other red flags of diversion, including but not limited to suspicious orders.

300.     CVS was aware of the suspicious orders that flowed from its distribution facilities into its own stores. CVS simply refused to identify, investigate, and report suspicious orders even though CVS knew, or should have known, that opioids it distributed and sold were likely to be diverted.

301.     CVS failed to report suspicious orders, failed to meaningfully investigate or reject suspicious orders, and failed to prevent diversion, or otherwise control the supply of opioids flowing into Connecticut.

302.     CVS failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

303.     CVS knew or should have known that the opioids being distributed and dispensed by it were likely to be diverted.  Yet it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

304.     Given CVS's retail pharmacy operations, in addition to its role as a wholesale distributor, CVS knew, or reasonably should have known, about the disproportionate flow of

opioids into Connecticut and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for diversion.

305.   CVS knew, or deliberately turned a blind eye to, its pharmacies' role in diversion of opioids.  CVS knew or should have known that its pharmacies in and around Connecticut and Plaintiffs' communities were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription cocktails; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  CVS had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

306.   Failures regarding dispensing in CVS's Florida stores also allowed diverted opioids to be funneled into Connecticut and demonstrated the failures of CVS systems. CVS saw huge increases in the quantity of oxycodone it dispensed in Florida from 2006 to 2010. For example, starting with an already high baseline, a single CVS store ordered in 2006 approximately four times the amount of oxycodone a typical pharmacy orders in one year.  By 2010, the same pharmacy's 10-month history showed quantities more than thirty times the amount of oxycodone a typical pharmacy orders in one year, and the pharmacy's supervisor could not explain why the volume was so high. During that time, Cardinal was the pharmacy's main distributor, and two of

CVS's Florida pharmacies were among Cardinal's top four retail pharmacy customers, dispensing a staggering amount of oxycodone compared to Cardinal's other Florida customers. Employees of these pharmacies routinely observed red flags and obvious signs that they were filling illegitimate prescriptions. One set a daily limit of oxycodone 30mg prescriptions the pharmacy would fill each day, basing the limit on the amount in stock that day, so as to ensure that the "real pain patients" could get their prescriptions filled.[13] The pharmacy usually reached its limit by lunchtime each day, and at times within 30 minutes of opening.  Customers, aware that prescriptions were first come, first served, would line up outside the store as early as 7:45 AM.  An employee acting as a "bouncer" included among his job duties escorting off the premises customers who were "hooked" on opioids and became belligerent if their prescriptions were refused.[14]  Although CVS had in place dispensing guidelines for controlled substances prescriptions, these guidelines were not followed at these stores.  Rather, they dispensed controlled substances prescriptions despite the existence of "warning signs" in the guidelines.[15]

307.    CVS has access to complete information regarding red flags of diversion across its pharmacies in and around Connecticut, but CVS chose not to utilize this information and failed to effectively prevent diversion.

308.    Until October 6, 2014, CVS pharmacies ordered and were supplied FDA Schedule III hydrocodone combination products (HCPs) from a combination of outside vendors and CVS distribution centers.  CVS pharmacies also received Schedule II opioids from outside vendors,

---

[13] Declaration of Joseph Rannazzisi, Holiday CVS, LLC d/b/a CVS/Pharmacy Nos. 5195/219 v. Eric Holder, Jr. et al., No. 1:12-cv-191, Doc. 19-6 ¶¶ 38-41 (D.D.C. Feb. 24, 2012).
[14] Id. ¶ 41.d.
[15] Id. ¶¶ 48 & 56.

with Cardinal and McKesson acting as its outside suppliers for the entire period for which ARCOS is available.

309.     CVS instituted, set-up, ran, directed, and staffed with its own employees the majority of the SOM functions for its pharmacy stores.

310.     CVS lacked meaningful policies and procedures to guide its pharmacy staff in maintaining effective controls against diversion, even as they evolved over time. Not until 2012 did CVS create guidelines explaining in more detail the "red flags" or cautionary signals that CVS pharmacists should be on the lookout for to prevent diversion and to uphold their corresponding responsibilities to ensure that all dispensed controlled substances are issued for a legitimate medical purpose.

311.     Even so, CVS's conduct, and the volume it dispensed in the State thereafter indicates that its policies were not applied.  In addition, as discussed further below CVS had performance metrics in place that pressured pharmacists to put profits ahead of safety.

312.     CVS failed to use data held at the corporate level to assist pharmacists in evaluating red flags of diversion. CVS's later dispensing policies and procedures make clear that for the majority of the time CVS had been engaged in the sale and dispensing of opioids, there was no meaningful integration of data and information that was within the possession and control of CVS corporate personnel.

### 5.     Rite Aid Failed to Provide Effective Controls against Diversion

313.     According to the data from the DEA's ARCOS database, between 2006 and 2014, Rite Aid distributed 56,057,050 dosage units of hydrocodone and oxycodone to its pharmacies in Connecticut. The volume of opioids Rite Aid brought into Connecticut and ultimately dispensed from its pharmacy locations was so high as to indicate to Rite Aid that not all of the prescriptions distributed to and dispensed out of its Connecticut stores could be for legitimate medical uses.

314.     In 2009, as a result of a multi-jurisdictional investigation by the DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of the CSA.

315.     The investigation revealed that from 2004 onwards, Rite Aid pharmacies across the country had a pattern of non-compliance with the requirements of the CSA and federal regulations that lead to the diversion of prescription opioids in and around the communities of the Rite Aid pharmacies investigated. Rite Aid also failed to notify the DEA of losses of controlled substances in violation of 21 USC 842(a)(5) and 21 C.F.R 1301.76(b).

316.     Rite Aid distributed Schedule III ("CIIIs") controlled substances (e.g., hydrocodone combination products) to its own Rite Aid stores until late 2014.

317.     Rite Aid's controlled substance distribution process was fairly simple. Rite Aid used a computerized "auto-replenishment system" (ARS) through which individual Rite Aid pharmacies would generate orders that were sent to the distribution center (DC). This ARS relied directly on dispensing data and the dispensing patterns of individual Rite Aid stores. If the ARS generated an order that was above Rite Aid's universal 5,000 dosage-unit (DU) threshold, the DC employees filling the order were supposed to manually recognize that the order was above threshold. If they did observe an order over threshold, the only "review" of the order was an attempt to call the pharmacy that placed the order to verify the order amount was correct (i.e., that it was not a "fat-finger" error). If the pharmacy confirmed that the above-threshold order amount was correct, or if the DC simply could not contact the pharmacy, the order was cut to the threshold and shipped. All the above-threshold orders were supposed to be maintained on a handwritten log containing only basic information about the order.

318.    After the orders had shipped, Rite Aid monitored its inventory through its Navicase/Naviscript system.  The Rite Aid Asset Protection Department used "key performance indicators" (KPIs) to analyze data about ordering from the Rite Aid stores to identify diversion through theft.  Yet, as numerous Rite Aid witnesses have testified, Rite Aid did not use the Navicase/Naviscript system to identify—much less report—suspicious orders.  Furthermore, assuming that the Navicase/Naviscript could identify suspicious orders, the Navicase/Naviscript data analysis only took place after shipment.  Rite Aid's 30(b)(6) representative in the MDL, Janet Getzey Hart, testified that the "asset protection KPIs were utilized to review orders and then lead to diversion cases if there were some issues with it," but "they were not used to report suspicious orders."

319.    Rite Aid maintained a small, inadequate list of suspicious prescribers but did not make any efforts to identify or report any suspicious orders from stores Rite Aid knew were dispensing prescriptions for those suspicious prescribers.  Further, given that orders would have already shipped, Rite Aid did not incorporate "suspicious prescriber" information that it may have collected in determining whether an order from any location was suspicious.

320.    Rite Aid's distribution system made it nearly impossible for any order to be identified, much less reported, as suspicious.  As a result of the company's policies and procedures, Rite Aid did not—and indeed, could not—identify what was unusual because all Rite Aid DCs had a static, blanket threshold for all Rite Aid stores above which Rite Aid would cut the order.  The threshold, which never changed, was set at of 5,000 DUs, per national drug code (NDC), per order (although Rite Aid does not know why it was set at 5,000 DUs).  Rite Aid stores typically ordered once per week, but some stores ordered twice per week and others ordered every two

weeks. That means that at its lowest, the Rite Aid threshold was 10,000 DUs per month, per store, and at its highest it was 40,000 DUs per month, per store.

321.    Rite Aid also had little to no records about past order history to determine if an order was suspicious. All Rite Aid distribution centers kept what was called a "Threshold Log," which contained in hard copy only basic information about orders that exceed the threshold: date of order, store number, item number, item description, quantity ordered, allowable quantity, and the reason for the allowable quantity. But any use of the log to potentially identify suspicious orders was only done sporadically and after the above-threshold orders were cut and shipped.

322.    Rite Aid placed the responsibility to identify orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency on employees whom the DEA coordinator at the Rite Aid's distribution center testified were not able to actually do so.

323.    Recognizing its failure to have a system, Rite Aid did begin to develop a suspicious order monitoring system for the first time in 2013. In documenting such efforts, Rite Aid stated as follows:

> The purpose of this project is to develop effective controls against the diversion of controlled substances and conduct adequate due diligence to ensure that controlled substances distributed from the Distribution Centers are for legitimate patient needs. Rite Aid must ensure compliance with 21 U.S.C. 823 and/or C.F.R. 1307.74(b) to detect and report suspicious orders of controlled substances through the Distribution Centers.

324.    In the end, however, Rite Aid never adopted the new SOM system because it stopped distributing controlled substances before this system could be implemented.

325.    Rite Aid conspired with McKesson to avoid suspicious order reporting. McKesson was Rite Aid's exclusive wholesaler for Schedule II controlled substances, including

opioids, during the relevant time period.  Rite Aid also ordered CIIIs from McKesson during the relevant time period.  Rite Aid ordered CIIIs from McKesson not only when it stopped self-distributing in late 2014, but McKesson also supplemented Rite Aid stores' supply of Schedule III controlled substances during the period when Rite Aid self-distributed controlled substances.

326.    McKesson provided Rite Aid with notification of stores hitting McKesson's thresholds and regularly granted threshold increases without conducting any due diligence.  For example, when a McKesson report revealed a number of Rite Aid stores were at 90% of their threshold and about to be flagged, McKesson offered to—and did—increase the thresholds for all Rite Aid locations by 50%.  McKesson also forwarded daily monitoring reports to Rite Aid so that Rite Aid could "let [McKesson] know" if McKesson "need[ed] to make any adjustments to current thresholds."

327.    On one occasion, Rite Aid noted that over 10% of its stores came close to being blocked, and McKesson simply asked Rite Aid how high it wanted the thresholds increased. McKesson also prompted Rite Aid to delay its orders until the next month in order to avoid hitting monthly thresholds when they were getting close.

328.    Rite Aid allowed its stores to order from McKesson without any restriction and failed to take those orders into account in Rite Aid's self-distribution SOM system, negating any constraints from Rite Aid's even limited internal controls.

329.    Rite Aid violated the standard of care for a distributor by failing to:  (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

330.    The volume of opioids Rite Aid shipped into, and dispensed from locations in, Connecticut and Plaintiffs' communities is so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.

331.    Rite Aid funneled far more opioids into Connecticut and Plaintiffs' communities than could have been expected to serve legitimate medical use, and ignored other red flags of suspicious orders. This information, along with the information known only to distributors such as Rite Aid (especially with its pharmacy dispensing data), would have alerted Rite Aid to potential diversion of opioids. Yet, Rite Aid admits that it never identified any suspicious orders before or after shipment, much less reported any suspicious orders to the DEA.

332.    Rite Aid, by virtue of the data available to it, was actually aware of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails" known for their abuse potential, such as oxycodone and Xanax; (3) individuals who arrived together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area. However, Rite Aid ignored these obvious red flags.

333.    Rite Aid, therefore, was aware of the suspicious orders that flowed from its distribution facilities. Rite Aid refused to identify, investigate, and report suspicious orders despite its actual knowledge of drug diversion. Rather, Rite Aid failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into Connecticut and Plaintiffs' communities.

334.    Rite Aid failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

93

335.     Rite Aid was, or should have been, fully aware that the opioids it distributed and dispensed were likely to be diverted; yet, it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to identify and report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

336.     Given Rite Aid retail pharmacy operations, in addition to its role as a wholesale distributor, Rite Aid knew or reasonably should have known about the disproportionate flow of opioids into Connecticut and Plaintiffs' communities and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, illicit supply and diversion.

337.     Rite Aid pharmacies routinely dispensed opioids in violation of the Controlled Substances Act and accompanying regulations.  Such conduct was a result of Rite Aid's lack of robust policies and procedures regarding dispensing controlled substances as well as Rite Aid's focus on profitability over its legal obligations and public safety.

338.     Rite Aid's dispensing policies and procedures used at all its Rite Aid pharmacies nationally were deficient in many ways.  A few examples are illustrative.

339.     Despite acknowledging the opioid epidemic many years earlier, Rite Aid implemented a policy for dispensing "high-alert" controlled substances—including opioids—for the first time in 2013.  The policy was little more than a piece of paper consisting of six steps: 1) Receive the prescription; 2) Validate the Prescription; 3) Validate the Prescriber; 4) Validate the Patient; 5) Decide to dispense or not to dispense; and 6) Report any suspicious activity.  Yet Rite Aid provided little to no guidance on how to perform the vague tasks and the policy was little more than words on a page.

340.     It was not until 2015 that Rite Aid integrated its High Alert process into its dispensing software. The 2015 update was the first time Rite Aid was able to systematically document due diligence—to the extent any was actually done—performed before dispensing.

341.     Not until 2015 did Rite Aid start to track refusals to fill. The number of refusals, however, was extremely small.

342.     Rite Aid also did nothing to ensure that even its pro forma policies were being followed. Rite Aid did not meaningfully audit its pharmacies for compliance with its own controlled substances dispensing policies or compliance with the CSA's requirements regarding legal dispensing.

343.     As a sophisticated, national chain pharmacy, Rite Aid had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. Its own data would have allowed Rite Aid to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper or illegitimate prescribing.

344.     Yet, Rite Aid only started tracking "High Alert data" in September 2015 at the corporate level. Even then, between 2015 and 2018, the corporate monitoring of prescriptions was limited only to certain drugs (oxycodone 30mg, methadone 10mg, and hydrocodone combination products 10/325 mg) and prescriptions paid for with high amounts of cash (more than $1,000). Even for those limited drugs, Rite Aid only tracked when 500 dosage units were dispensed at one time for oxycodone products and 240 dosage units were dispensed at one time for hydrocodone products. These extremely limited parameters meant that Rite Aid's corporate monitoring only identified an extremely small subset of suspicious dispensing activity.

345.    Rite Aid did not use the data to effectively comply with its legal obligations to prevent diversion and ensure only legal prescriptions were being filled at its pharmacies. For example, a review of the top pharmacies' percentage controlled to non-controlled was not something that was done before 2018.

346.    Rite Aid provided its pharmacists no visibility into the data it collected, thereby depriving them of an invaluable resource when evaluating prescriptions.

347.    Rite Aid did not make it possible, much less easy, for pharmacists to share information about red flags, suspicious prescribers, and suspicious patients. For example, despite Rite Aid instructing pharmacists that it is a red flag for a prescriber not to take insurance, the only way a pharmacist would know the existence of such a red flag is "through word of mouth." In addition, Rite Aid did not provide pharmacists any analytics from its system to identify cocktail prescription trends. Rite Aid pharmacists also did not have any way to identify pattern prescribing beyond the pharmacist's own personal knowledge. Rite Aid pharmacists could not even look up the prescriptions filled for a prescriber at Rite Aid pharmacies. Rite Aid did not provide any assistance to assist pharmacists to recognize pattern prescribing. Rite Aid pharmacists could also not look up things such as the "top oxycodone/methadone/hydrocodone prescribers" at a pharmacy or a "prescriber's rank in the dispensing quantity, script count and patient out-of-pocket expenses for the base code."

348.    Rite Aid also did not track refusals to fill before 2015. Before 2015, the only place pharmacists were supposed to document a refusal was on the hard copy prescription itself. But because the hard copy prescription was given back to the patient after the refusal was notated on it, there was no record of that refusal at Rite Aid. Only after Rite Aid incorporated the red flag verification questions into NexGen as part of the 2015 update to the High Alert process did Rite

Aid have any records of refusals to fill. Even then, pharmacists would refuse prescriptions "every day" without using the NexGen process, and have no record of them.

349.    This lack of refusal information meant even if a prescription was routinely denied by numerous pharmacists because of the illegitimacy of the prescription, a Rite Aid pharmacist would not necessarily know that key fact or be able to take that information into account when performing due diligence.

350.    Even when it did start to record refusals to fill through the red flag verification questions, Rite Aid pharmacies only refused to fill extremely small numbers of prescriptions. Rite Aid did not leverage the information about refusals to fill to help identify diversion. While a pharmacist could see in an individual patient's profile if a prescription was denied through the six-step process after 2015, it was still a manual process for a pharmacist to look at a patient's profile. Also, there was no way for a pharmacist to determine if a prescriber was routinely having prescriptions denied by Rite Aid pharmacies. There was also no process for reviewing the refusal to fill data to look for patterns or other pertinent information.

351.    Rite Aid also did little to identify suspicious prescribers such as those who operated pill mills. Before 2013, there was not a formal process for how pharmacists were to report prescribers whose prescribing was suspicious.

352.    After 2013, pharmacists could report a potentially suspicious prescriber via a "RACS ticket" and the corporate government affairs office would investigate the issue. Besides responding to acknowledge the RACS ticket was received, however, none of the corporate analysis was ever shared with pharmacists. As part of the prescriber investigation process, Rite Aid would determine a prescriber to be high, medium, or low risk. Yet pharmacists were never told a prescriber's risk ranking. Additionally, the prescriber activity reports generated by the corporate

office as part of the investigation were not shared with the pharmacist.  The prescriber review process also looked at IQVIA/IMS data starting in late 2013 but Rite Aid pharmacies and pharmacists cannot access the IMS/IQVIA data.  All while the investigation was happening— which could take months—the pharmacies were still able to fill prescriptions for doctors under investigation.  Thus, Rite Aid pharmacists were kept in the dark about information that would help them evaluate prescriptions.

353.    Rite Aid blocked an extremely low number of prescribers. As of 2018, Rite Aid only blocked 108 prescribers.  The blocked prescribers were a small fraction of the total of 2,367 prescriber files Rite Aid maintained and nearly 4,600 prescribers Rite Aid had on its master prescriber monitoring spreadsheet.  So despite allegedly empowering its pharmacists to make the ultimate decision whether to dispense a prescription, Rite Aid nearly simply ignored pharmacists' concerns about prescribers.

354.    In contrast to its lack of robust policies to ensure only prescriptions issued for a legitimate medical purpose were dispensed, Rite Aid had numerous and detailed policies regarding metrics to ensure its profitability.  These policies ensured that Rite Aid pharmacists did not have the time, resources, or support to adequately discharge not only their legal duties as pharmacists, but also their alleged duties under Rite Aid's own policies and procedures.

355.    Rite Aid drove its pharmacists to fill higher rates of prescriptions across the board, leading up to its 2009 settlement with the DEA, in which it paid $5 million in civil penalties for its improper dispensing practices.  For example, in 2007, an internal Rite Aid email described 52 stores that filled 10 or less Schedule II prescriptions over a 12-week period as "store opportunities here that are being missed" in the context of "our emphasis on prescription growth."

356.    Even after the 2009 settlement and civil penalty fine, Rite Aid continued its emphasis on increased prescription fill rates. In an internal 2010 Rite Aid email, Rite Aid corporate employees describe discussions with the "EBITDA [a measure of cash profit from operations] Focus Team" on opportunities to grow Schedule II prescriptions. The email notes, "we would then target stores that fell below the average and have discussions…surrounding future CII opportunities." Rite Aid targeted these stores despite the fact that some stores were not processing Schedule II prescriptions because "pharmacists are not comfortable with the potential LP type issues that may occur."

357.    In 2011, Rite Aid released an internal memo entitled its "2011 Game Plan." In that memo, Rite Aid expressed its push to fill more prescriptions as its singular, driving focus: "We must fill more prescriptions, our future as a company is dependent on this fact…Staffing our stores with the right Pharmacist and Technicians dedicated to growing the business and being the best Health Care Provider is non-negotiable." Rite Aid thus prioritized staffing of pharmacy personnel with people specifically dedicated to filling more prescriptions, rather than to patient care. Conspicuously absent from Rite Aid's "2011 Game Plan" is a plan to address the abuse and addiction of opioids in the communities Rite Aid served.

358.    That same year, an internal Rite Aid PowerPoint presentation described the role of Rite Aid's Pharmacy District Managers, explaining, "Driving Top-line prescription sales through aggressive prescription growth – This is YOUR NUMBER 1 JOB!" (emphasis in original). That slide emphasized the direct pressure Rite Aid put on that role by adding, "You and your pharmacy manager are accountable for prescription count exceeding plan." That presentation further identified Pharmacy District Manager responsibilities to "maximize profits" and "work with a Sense of Urgency to drive financial performance" (emphasis in original). Rite Aid

acknowledged that increasing prescription counts year over year was the top priority Rite Aid placed on each of its pharmacies.

359.    Rite Aid also placed strict emphasis on its pharmacists filling prescriptions as quickly as possible. According to the findings of a 2011 study, Rite Aid pharmacists spent 3.22 minutes total on any given prescription fill, being able to fill 18.66 scripts in a single hour. Under that analysis, there was no apparent time allocated for pharmacists to conduct any kind of meaningful red flag analysis to validate the legitimacy of prescriptions of controlled substances.

360.    In 2011, Rite Aid adopted a policy whereby it promised to fill prescriptions in 15 minutes or less. If a prescription took more than 15 minutes to fill, the patient would get a $5 gift card. In a 2013 internal Rite Aid email, Karen Staniforth, the Senior Vice President of Pharmacy, emailed to indicate the time spent verifying DEA licenses of prescribers "is going to affect the 15-minute promise…especially once the other steps for prescription validation are in place" (emphasis added). Her concern suggests that pharmacists were not actually spending meaningful time validating controlled substance prescriptions before the six-step process was formalized in 2013.

361.    Rite Aid touted the program as something consumers wanted, but many others recognized the danger such a program was to patients and the practice of pharmacy. Numerous State Boards of Pharmacy objected to the program. As the chair of the Illinois State Board of Pharmacy said: "This is 180 degrees away from everything we are trying to do in moving the pharmacy profession toward being patient information-focused rather than product-focused. And it's counter to our many efforts to improve patient safety."

362.    Despite eventually doing away with the 15 minute or less promise, Rite Aid continued to carefully track its pharmacists' prescription fill speeds, thereby ensuring that the

pharmacists were not able to exercise their corresponding responsibility under the law. In fact, Rite Aid pharmacies routinely filled prescriptions at a pace of multiple prescriptions per minute.

363.    Rite Aid's compensation policies also discouraged pharmacists from preventing illegitimate prescriptions from being dispensed. Rite Aid's compensation policies provided bonuses that depended on the number of prescriptions—including opioids—dispensed from Rite Aid pharmacies.

364.    From fiscal years 2006-2008, Rite's annual Store Bonus Program Summaries structured staff pharmacist bonuses weighted 80% from store profits (including profits from controlled substance prescriptions), and 20% from customer satisfaction. In fiscal year 2009, Rite Aid altered its Store Bonus Program Summary to specify that "script achievement" itself is "one of two criteria used to determine and calculate bonus awards for all eligible Pharmacy participants." This new formulation weighted bonuses by 50% for prescription achievement and 50% for customer satisfaction. Also, in fiscal year 2009, Rite Aid honed this pharmacist incentive policy in its "Prescription Incentive Bonus Program," specifically noting, "Participation in this program is designed to reward our pharmacy & front- end associates for increasing their overall prescription business." That policy even went so far as to encourage pharmacists to contact patients to pick up orders for "pain medicine" to increase prescription sales.

365.    Rite Aid's 2009 bonus incentive policy, which emphasized "script achievement" for its pharmacists, continued through 2013. In 2013, Rite Aid transitioned to a "Pay for Performance (P4P)" model, which adjusts compensation based on whether the pharmacy met certain business goals, such as increasing prescription counts. That policy specifies, "Overall Compensation Performance Summary will reflect an increase in compensation as a result of increasing store designation through increased prescription counts." It was not until 2015 that Rite

Aid expressly excluded controlled substances from prescription counts for its pharmacist bonus calculations. Despite excluding controls from its calculations, however, incentives to fill illegitimate prescriptions remained folded into Rite Aid's policy. Specifically, 20% of a staff pharmacist bonus is comprised of the "Customer Service and Associate Experience Indicator." That means customer complaints for a pharmacist's refusal to fill a suspicious prescription may negatively impact that pharmacist's bonus. Rite Aid continued this policy structure through at least fiscal year 2019. Rite Aid accordingly continues to financially incentivize its pharmacists to fill as many prescriptions as possible, even if a pharmacist suspects a prescription is likely subject to diversion.

366.    Rite Aid's compensation structure presented a conflict of interest for pharmacists on two fronts: (1) to fill as many prescriptions as possible to increase the store profit metric, and (2) to fill as many prescriptions as possible to avoid complaints from patients seeking to fill even illegitimate prescriptions, so as to increase the customer satisfaction metric. In this structure, a pharmacist would necessarily receive a higher bonus for filling illegitimate prescriptions (by increasing store profits and maintaining high customer satisfaction rates). On the other hand, rejecting illegitimate prescriptions would decrease the metrics of both bonus components, and decrease the final bonus amount a pharmacist could receive.

367.    The problem of illegal dispensing caused by Rite Aid's focus on quickly filling prescriptions and increasing the number of prescriptions dispensed was also exacerbated by Rite Aid's inadequate pharmacy staffing. Often, single pharmacists were left as the only pharmacist at a location for entire shifts. This greatly cut into the ability of the pharmacist to evaluate each prescription

368.     Rite Aid knew or should have known that an excessive volume of pills was being sold into Connecticut and Plaintiffs' communities.

369.     The sheer volume of prescription opioids distributed to and dispensed by Rite Aid pharmacies in Connecticut and Plaintiffs' communities is indicative of potential diversion and required appropriate due diligence.

370.     Rite Aid knew or should have known that its pharmacies in Connecticut and Plaintiffs' communities were: (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.  Rite Aid had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

371.     Rite Aid has access to complete information regarding red flags of diversion across its pharmacies in Connecticut and Plaintiffs' communities, but Rite Aid failed to utilize this information to effectively prevent diversion.

6.     **Multiple Enforcement Actions against Defendants Confirm Their Compliance Failures**

372.     Defendants have long been on notice of their failure to abide by state and federal law and regulations governing the distribution and dispensing of prescription opioids. Indeed, several of Defendants have been repeatedly penalized for their illegal prescription opioid practices. Based upon the widespread nature of these violations, these enforcement actions are the product of, and confirm, the failures of national policies and practices of Defendants.

373.     Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion.  According to its website, Walgreens operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

374.     Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history at the time—$80 million—to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black market sales.  These actions demonstrate Walgreens's knowledge of, and disregard for, its obligations to prevent diversion.

375.     On September 30, 2009, the DEA issued an Order to Show Cause against a Walgreens retail facility in San Diego, California based in part on allegations that it was dispensing controlled substances, including opioids, to individuals that it knew or should have known were diverting the controlled substances.  Although the Order addressed this specific location, the response, including Walgreens's internal assessment of its compliance, or lack thereof, revealed systemic failures from which its pharmacies in the County would not have been exempt.

104

376.    In April 2011, Walgreens entered into an Administrative Memorandum of Agreement ("2011 MOA") with the DEA arising from the San Diego OTSC and expressly agreed that it would "maintain a compliance program to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations" including regarding the dispensing practices at all of its nationwide pharmacies.

377.    On September 14, 2012, however, the DEA also issued an *Order to Show Cause and Immediate Suspension Order* ("ISO"), described above against Walgreens's Distribution Center in Jupiter, Florida, as well as Orders to Show Cause related to certain Walgreens pharmacies. Evidencing the existence of systemic failures, the ISO stated that, "[DEA's] concerns with [Walgreens'] distribution practices are not limited to the six Walgreens pharmacies [discussed in the ISO]."

378.    In 2013, Walgreens agreed to the largest settlement in DEA history at the time—$80 million—to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black-market sales. In addition to the monetary payment, the Jupiter, Florida distribution center lost its authority to distribute or dispense controlled substances, including opioids, for two years. The Department of Justice, in describing the settlement, explained that the conduct at issue included Walgreens's "alleged failure to sufficiently report suspicious orders was a systematic practice that resulted in at least tens of thousands of violations and allowed Walgreens's retail pharmacies to order and receive at least three times the Florida average for drugs such as oxycodone."[16]

---

[16] Press Release, U.S. Attorney's Office S. Dist. of Fla., Walgreens Agrees To Pay A Record Settlement Of $80 Million For Civil Penalties Under The Controlled Substances Act, U.S. Dep't of Just. (June 11,

379.    The settlement resolved investigations into, and allegations of, CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

380.    As part of the 2013 MOA described above, Walgreens "acknowledge[d] that certain Walgreens retail pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with its compliance obligations under the CSA . . . and its implementing regulations." The 2013 MOA required Walgreens to, among other things, "maintain a compliance program in an effort to detect and prevent diversion of controlled substances" as required by law.

381.    Walgreens's Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids.  Walgreens's Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount.

382.    They increased their orders over time, in some cases as much as 600% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period.  Yet Walgreens corporate officers not only turned a blind eye, but provided pharmacists with incentives through a bonus program that compensated them based on the number of prescriptions filled at the pharmacy.  Yet Walgreens corporate officers turned a blind eye to these abuses.  In fact, the long term Controlled Substance Compliance Officer at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not

2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under-controlled.

documenting our own potential noncompliance," underscoring Walgreens's attitude that profit outweighed compliance with the CSA or the health of communities.

383.    Walgreens's settlement with the DEA stemmed from the DEA's investigation into Walgreens's distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens's corporate headquarters pushed to increase the number of oxycodone sales to Walgreens's Florida pharmacies, and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year, and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center, a distribution center that also distributed into the County.

384.    An August 2013 email shows Walgreens understood the consequences of its actions, explaining that Walgreens's "previous system would continue to send additional product to the store without limit or review which made possible the runaway growth of dispensing products like Oxycodone."

385.    Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).

386.    The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

387.    In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and didn't use sound

professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.

388.    Most recently, as mentioned above, in *City and County of San Francisco v. Purdue Pharma L.P.*, Case No. 18-cv-07591-CRB, Doc. No. 1578, filed 8/10/22, the court held that Walgreens' conduct in the distribution and dispensing of opioids substantially contributed to the opioid crisis in San Francisco, saying "The aggregate evidence that Plaintiff presented at trial was not only adequate to establish Walgreens' culpability—it was devastating." *Id*. at 105

389.    The actions against Walgreens as both a distributor and a retail pharmacy demonstrate it routinely, and as a matter of standard operating procedure, violated its legal obligations under the CSA and other laws and regulations governing the distribution and dispensing of prescription opioids.

390.    In addition to the actions described herein against Walmart, a prosecution against a Virginia prescriber revealed failures at Walmart pharmacies from 2007 to 2012. A Decision and Order in that case revealed that a Walmart pharmacy would fill prescriptions pursuant to a telephone message from a staff member of the prescriber, purportedly on behalf of the prescriber, even though she failed to provide the prescriber's DEA number. Despite the absence of information required by DEA regulations, the Walmart pharmacy would fill the prescription.[17] By mid-November of 2008, three Walmart pharmacies had dispensed more than 200 hydrocodone prescriptions and refills on behalf of the prescriber. In 2012, the prescriber learned that someone was fraudulently using his DEA number. He called a Walmart pharmacy regarding refill requests faxed

---

[17] DOJ, DEA, Docket No. 15-26, [FR Doc. No. 2017-13158] Peter F. Kelly, D.P.M.; Decision and Order, https://www.deadiversion.usdoj.gov/fed_regs/actions/2017/fr0623.htm.

from his office, and advised "that somebody was fraudulently using [his] DEA number."[18] Although he asked that his DEA number be blocked, the same pharmacy still filled two prescriptions on his behalf after this alert. Although Walmart did not face sanctions for its conduct, the Opinion and Order described "the fact that prescriptions which were missing [the] Respondent's DEA number were routinely filling notwithstanding that they were facially invalid," and "that the prescriptions were for hydrocodone in quantities and dosings that were clearly outside the scope of what is usually prescribed by podiatrists" as "deeply disturbing."[19]

391.    Federal prosecutors had also taken action against five Walmart and Sam's Club Pharmacies in Texas, alleging that they failed to keep records required to help prevent diversion of controlled substances as required by the CSA. Specifically, "accountability audits did not match the drugs on hand, revealing major overages and shortages in the accountability of controlled substances, and there were missing invoices for controlled substances all in violation of the CSA."[20] A U.S. Attorney further explained that "[b]ecause of the pharmacies' lack of proper record keeping, a variety of Schedule II, III, IV and V controlled substances were lost or stolen and possibly diverted."[21]

392.    As recently as September 2018, minutes of an Oklahoma State Board of Pharmacy meeting reflect that an Oklahoma "Wal-Mart Pharmacy was charged with multiple violations of state and federal regulations and rules including establishing and maintaining effective controls

---

[18] https://www.deadiversion.usdoj.gov/fed_regs/actions/2017/fr0623.htm
[19] Id.
[20] Associated Press, *Wal-Mart Settles Drug Records Accusation*, (Jan 7, 2009), http://prev.dailyherald.com/story/?id=262762
[21] Id.

against diversion of prescription drugs."[22] Walmart agreed to pay a fine to resolve the seven alleged violations.

393.    CVS is one of the largest companies in the world, with annual revenue of more than $250 billion. According to news reports, it manages medications for nearly 90 million customers at 9,700 retail locations. CVS could be a force for good in connection with the opioid crisis, but like other Defendants, CVS sought profits over people.

394.    CVS is a repeat offender and recidivist: the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States DOJ. It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

395.    Confirming its systemic failures to implement and adhere to adequate controls against diversion, CVS has repeatedly faced enforcement actions. In May 2020, CVS's Omnicare subsidiary agreed to pay a $15.3 million civil penalty as part of a settlement with the DEA resolving allegations that it improperly dispensed opioids and other controlled substances to long-term care facilities without a valid prescription.

396.    In March 2019, CVS Pharmacy, Inc. (including all of its relevant subsidiaries and affiliates) entered into a $535,000 settlement with the U.S. Attorney's Office for the District of Rhode Island, acting on behalf of the United States and the DEA's Providence Office.   In connection with the settlement, a DEA agent stated: "Pharmacies put patients at risk when they

---

[22] https://www.ok.gov/pharmacy/documents/Min%20September%202018.pdf.

dispense Schedule II narcotics, which have the highest potential for abuse, without a valid and legal prescription."[23]

397.     In August of 2018, CVS paid $1 million to resolve allegations that CVS pharmacies throughout the Northern District of Alabama violated record-keeping requirements under the CSA and its implementing regulations, the largest civil fine paid in Alabama by a DEA registrant.

398.     In June of 2018, CVS paid $1.5 million to resolve allegations that CVS pharmacies in Long Island, New York failed to timely report the loss or theft of controlled substances, including hydrocodone, recognized as one of the most commonly diverted controlled substances.

399.     In July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.[24]

400.     This fine was preceded by numerous others throughout the country.

401.     In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filling prescriptions with no legitimate medical purpose.

402.     In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.

403.     In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the

---

[23] https://www.dea.gov/press-releases/2019/04/16/cvs-pay-535000-filling-invalid-prescriptions.
[24] Press Release, U.S. Attorney's Office E. Dist. of Cal., CVS Pharmacy Inc. Pays $5M to Settle Alleged Violations of the Controlled Substance Act, U.S. Dep't of Just. (July 11, 2017), https://www.justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violations-controlled-substance-act.

state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.

404.    In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances—mostly addictive painkillers—more than 500 times between 2011 and 2014.

405.    In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug.   Additionally, the government alleged that CVS had recordkeeping deficiencies.

406.    In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."

407.    In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations it filled prescriptions written by a doctor whose controlled-substance registration had expired.

408.    In 2013, CVS agreed to pay $11 million to resolve allegations it violated the CSA and related federal regulations at its retail stores in Oklahoma and elsewhere by: (1) creating and using "dummy" DEA registration numbers on dispensing records, including records provided to state prescription drug monitoring programs; (2) filling prescriptions from prescribers who lacked current or valid DEA numbers; and (3) substituting the DEA number of non-prescribing practitioners for the DEA numbers of prescribers on prescription records.

409.    Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.

410.    DEA hosted a December 8, 2010, meeting attended by CVS' Head of Pharmacy Professional Services, Papatya Tankut, and the CVS district supervisor before initiating an enforcement action.  CVS's counsel acknowledged at that time "that CVS was aware of the pill mill and/or pain clinic situation and the diversion of controlled substances, primarily oxycodone, in Florida," and that it received an October 2010 plea from a local sheriff "to work with law enforcement and closely scrutinize the prescriptions they receive."[25]  The DEA advised CVS "that the diversion of oxycodone, primarily originating from purported pain clinics, involves fraudulent prescriptions, doctor shoppers, and unethical doctors."[26]  "CVS was further advised of the typical 'red flags' associated with the diversion of controlled substances that a pharmacy should be familiar with in order to carry out its corresponding responsibility to ensure that the controlled substances are dispensed for a legitimate medical purpose."[27]  "Some of the 'red flags' discussed included: (a) many customers receiving the same combination of prescriptions (i.e., oxycodone and

[25] Decl. of Joseph Rannazzisi, Holiday CVS, L.L.C., v. Holder, Civ. No. 1:12-cv-191 (D. D.C Fed. 24, 2012).
[26] Id.
[27] Id.

alprazolam); (b) many customers receiving the same strength of controlled substances (i.e., 30

milligrams of oxycodone with 15 milligrams of oxycodone and 2 milligrams of alprazolam); (c)

many customers paying cash for their prescriptions; (d) many customers with the same diagnosis

codes written on their prescriptions ([e.g.], back pain, lower lumbar, neck pain, or knee pain); and

(e) individuals driving long distances to visit physicians and/or to fill prescriptions."[28]

411.    CVS also acknowledged its awareness of an increase in oxycodone prescriptions

at Florida CVS stores during the December 2010 meeting.  DEA discussed with CVS an ARCOS

summary which showed a "huge" increase at one CVS store, which was already ordering "more

than four times the amount of oxycodone a typical pharmacy orders in one year" in 2006; a more

recent 10-month history showed that it ordered "more than thirty times what a typical pharmacy

ordered in one."[29]  During the same meeting, DEA also made clear that CVS's instruction to its

pharmacists to call the prescriber to verify that a physician wrote the prescription was not the same

thing as making an independent determination that the prescription was written for a legitimate

medical purpose in the usual course of professional practice.

412.    DEA then hosted a second meeting with CVS at the DEA Weston Resident Office

on August 12, 2011.  Some 24 supervisors/managers from various South Florida CVS pharmacies

attended that meeting.  At that meeting, the DEA again reminded CVS of its corresponding

responsibility under the CSA and:

> the typical 'red flags' associated with the diversion of controlled
> substances that a pharmacy should be familiar with in order to carry
> out its corresponding responsibility to ensure that the controlled
> substances are dispensed for a legitimate medical purpose.  Some of
> the 'red flags' discussed included: (a) many customers receiving the
> same combination of prescriptions; (b) many customers receiving

---

[28] Id. ¶ 28.
[29] Id. ¶ 31.

the same strength of controlled substances; (c) many customers paying cash for their prescriptions; (d) many customers with the same diagnosis codes written on their prescriptions; (e) individuals driving long distances to visit physicians and/or to fill prescriptions; (f) customers coming into the pharmacy in groups, each with the same prescriptions issued by the same physician; and (g) customers with prescriptions for controlled substances written by physicians not associated with pain management (i.e., pediatricians, gynecologists, ophthalmologists, etc.)."

413.    The meeting also stressed the importance of CVS's obligations: a presentation included "statistical information" that "showed drastic increases in prescription drug overdose deaths."[30]

414.    After the DEA executed Administrative Inspection Warrants at two Florida CVS stores discussed in the meetings, interviews with CVS pharmacists revealed that no one spoke with the pharmacist in charge of one store about the staggering amounts of oxycodone discussed in CVS's December 2010 meeting with the DEA and the pharmacist was unfamiliar with multiple red flags.  Further, other CVS employees believed that "polic[ing] the patients" was outside their job description and they were filling prescriptions that were "probably were not legitimate."[31]  The CVS employees "consistently ignored the red flags of controlled substance diversion," and, until CVS faced heightened DEA scrutiny, filled prescriptions for more than twenty prescribers who later faced enforcement action themselves, none of whom were located in the same city as the stores, and most of whom were some distance away."[32]

415.    In 2009, as a result of a multi-jurisdictional investigation by the DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of

---

[30] Id. ¶ 34.
[31] Id. ¶ 41.
[32] Id. ¶¶ 43 & 54-55.

the CSA. The investigation revealed that from 2004 onwards, Rite Aid pharmacies across the country had a pattern of non-compliance with the requirements of the CSA and federal regulations that lead to the diversion of prescription opioids in and around the communities of the Rite Aid pharmacies investigated. Rite Aid also failed to notify the DEA of losses of controlled substances in violation of 21 USC 842(a)(5) and 21 C.F.R 1301.76(b).

**E.     Opioids Defendants Sold Migrated into Plaintiffs' Communities from Other Jurisdictions**

416.     As the demand for prescription opioids grew, fueled by their potency and purity, interstate commerce flourished: opioids moved from areas of high supply to areas of high demand, traveling across state lines in a variety of ways.

417.     First, prescriptions written in one state may, under some circumstances, be filled in a different state. But even more significantly, individuals transported prescription opioids from one jurisdiction specifically to sell them in another.

418.     When authorities in the certain states cracked down on opioid suppliers, out-of-state suppliers filled the gaps. Florida in particular assumed a prominent role, as its lack of regulatory oversight created a fertile ground for pill mills. Residents of other states area would simply drive to Florida, stock up on pills from a pill mill, and transport them back to home to sell. The practice became so common that authorities dubbed these individuals "prescription tourists" who would travel their "oxycodone pipelines" between their home states and Florida for their prescription opioid supplies. In fact, the route from Florida to other states was so well traveled that it became known as the "Blue Highway," a reference to the color of the 30mg Roxicodone pills manufactured by Mallinckrodt.

419.     Abundant evidence, thus, establishes that prescription opioids migrated between cities, counties, and states, including into Connecticut from other states. As a result, prescription

data from any particular jurisdiction does not capture the full scope of the misuse, oversupply and diversion problem in that specific area. As the criminal prosecutions referenced above show, if prescription opioid pills were hard to get in one area, they migrated from another. Distributors of opioids were fully aware of this phenomenon and profited from it.

**F.      Defendants Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids.**

420.    Defendants were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and retail sellers of opioids. Yet, instead of taking any meaningful action to stem the flow of opioids into communities, they continued to participate in the oversupply and profit from it.

421.    Defendants knew that the purpose of the controls mandated by the CSA was to prevent diversion of controlled substances. They knew that these drugs were subject to abuse and were dangerous when not used pursuant to instructions and oversight of a medical professional. Defendants also knew that there was an illegal market for these controlled substances and, unless properly controlled, the drugs were likely to be subject to diversion.

422.    It was foreseeable that the failure to maintain effective controls against diversion of Schedule II and Schedule III narcotics would lead to diversion of these drugs. It was foreseeable that once diverted, controlled substances would be sold in illegal markets and otherwise distributed to persons other than patients with legitimate prescriptions for these drugs. It was foreseeable that uncontrolled use of these drugs would lead to opioid use disorder in significant numbers of person exposed to uncontrolled opioids. It was further foreseeable that, once addicted, persons with opioid use disorder would seek out less expensive and more readily available opioids, including heroin and illegally-manufactured "street fentanyl."

423.     Defendants knew that the consequence of their failure to maintain effective controls against diversion of controlled substances would be an increase in unlawful and uncontrolled use of these drugs.

424.     Defendants knew or should have known that the quantity of opioids being distributed and dispensed by them exceeded legitimate medical demand, but they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

425.     Defendants were aware of the growing opioid crisis in the United States, and in Connecticut, but failed to address this crisis or meaningfully to change their practices in order to provide effective controls against diversion, even in the face of mounting evidence that controlled substances were being diverted and that such diversion was contributing to a crisis of opioid over-use and mis-use.

## G.     Defendants Conspired to Engage in the Wrongful Conduct Complained of Herein and Intended to Benefit Both Independently and Jointly from Their Conspiracy.

426.     Defendants took advantage of the industry structure, including end-running its internal checks and balances, to their collective advantage. Defendants agreed among themselves to increase the supply of opioids and fraudulently increase the quotas that governed the manufacture and supply of prescription opioids. Defendants did so to increase sales, revenue, and profit from their opioid products.

427.     The interaction and length of the relationships between and among the Defendants reflects a deep level of interaction and cooperation between Defendants in a tightly knit industry. Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

428.    Defendants collaborated to expand the opioid market in an interconnected and interrelated network in the following ways, as set forth more fully below, including, for example, membership in the NACDS and HDA.

429.    Defendants utilized their membership in the NACDS and HDA and other forms of collaboration to form agreements about their approach to their duties under the CSA to report suspicious orders. Defendants overwhelmingly agreed on the same approach—to fail to identify, report or halt suspicious opioid orders, and fail to prevent diversion. Defendants' agreement to restrict reporting provided an added layer of insulation from DEA scrutiny for the entire industry as Defendants were thus collectively responsible for each other's compliance with their reporting obligations. Defendants were aware, both individually and collectively, of the suspicious orders that flowed directly from Defendants' facilities.

430.    Defendants knew that their own conduct could be reported by other Defendants and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Defendants had an incentive to communicate with each other about the reporting or suspicious orders to ensure consistency in their dealings with DEA.

431.    Defendants also worked together to ensure that the opioid quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA in order to ensure that the DEA had not basis for refusing to increase or decrease production quotas due to diversion.

432.    The desired consistency, and collective end goal was achieved. Defendants achieved blockbuster profits through higher opioid sales by orchestrating the unimpeded flow of opioids.

**H.    Defendants Have Created and Maintained a Public Health Crisis in Connecticut and Plaintiffs' Communities**

433.    The volume of opioids distributed and sold in Connecticut and Plaintiffs' communities is so high as to raise a red flag that not all of the prescriptions being ordered and sold could be for legitimate medical uses.

434.    By helping to improperly inflate the opioid market, continuing to fill and failing to report suspicious orders of opioids, and by continuing to dispense opioids and "cocktails" of opioids and other drug despite indicia of diversion, Defendants have contributed to an oversupply of opioids in Connecticut generally and Plaintiffs' communities.  This oversupply allowed non-patients to become exposed to opioids, and facilitated access to opioids for both patients who could no longer access or afford prescription opioids and individuals struggling with addiction and relapse.  Defendants had financial incentives to sell higher volumes of opioids and not to report suspicious orders or guard against diversion, and to dispense opioids despite indicia of diversion.

435.    The diversion of opioids into Connecticut and Plaintiffs' communities fueled a spike in the illicit market for heroin.  Individuals addicted to prescription opioids often transition to heroin due to its lower cost, ready availability, and similar high. Despite the large number of individuals prescribed opioid drugs, there has been a decline in opioid prescriptions in recent years with a concurrent increase in heroin use.

436.    The oversupply of opioids also has had a significant detrimental impact on children throughout Connecticut and Plaintiffs' communities. Young children have access to opioids, nearly all of which were prescribed or supplied to adults in their household. If parents become addicted and turn to illicit opiates, children risk overdose from these drugs as well. Toddlers are particularly at risk, as they routinely put things in their mouths as they crawl and

explore their world. Tragically, Connecticut and Plaintiffs' communities have seen their share of children exposed to opioids, some of which have lost their lives as a result of such exposure.

437.    Even infants have not been immune to the impact of opioid abuse. There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome ("NAS") also known as neonatal opioid withdrawal syndrome ("NOWS"). These infants painfully withdraw from the drug once they are born, cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms. The long-term developmental effects are still unknown, though research in other states has indicated that these children are likely to suffer from continued, serious neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction. When untreated, NAS can be life-threatening. Recent reports suggest that the incidence of NAS in the U.S. increased by 433 percent from 2004 to 2014. In 2009, more than 13,000 infants in the United States were born with NAS, or about one every hour. As a result, Plans of Safe Care are now required by federal and state laws to be developed when an infant is born affected by substance use or withdrawal symptoms.

438.    Rising opioid use and abuse have negative social and economic consequences far beyond overdoses in other respects as well. According to an analysis by a Princeton University economist, approximately one out of every three working age men who are not in the labor force take daily prescription pain medication. The same research finds that opioid prescribing alone accounts for 20% of the overall decline in the labor force participation for this group from 2014-16, and 25% of the decline in labor force participation among women. Many of those taking painkillers still said they experienced pain daily.

439.    In 2007, the economic burden of prescription OUD on the Criminal Justice System (CJS) in the United States was over $5.1 billion. This cost grew to over $7.8 billion by 2016. The majority of these costs are born by the agencies within the local and state governments. Results of a 2017 report suggest that the annual costs associated with combating the opioid epidemic will have approximately doubled across all societal sectors, including the CJS, by 2020.[33]

440.    The financial burden to Plaintiffs of addressing the opioid crisis is staggering. Plaintiffs have expanded their own services and worked collaboratively with the community to confront this public health epidemic. Narcan administration has saved the lives of hundreds of its residents. Expanded addiction treatment services, recovery housing, and innovative programs have sought to help people heal. Plaintiffs would further expand these efforts, but have only so much funding, which the demands of this unprecedented epidemic have so overwhelmed. Plaintiffs are also faced with increased costs of drug crimes and other public services because of the opioid epidemic. Meanwhile, Defendants have not changed their ways or corrected their past misconduct, but instead are continuing to fuel the crisis.

441.    While Plaintiffs have committed substantial resources to address the crisis, the opioid epidemic is nowhere near contained. Fully addressing the crisis requires that those responsible for it pay for their conduct and to abate the nuisance and harms they have created in Plaintiffs' communities.

---

[33] Rhyan CN. The potential societal benefit of eliminating opioid overdoses, deaths, and substance use disorders exceeds $95 billion per year. Altarum website. altarum.org/sites/default/files/uploaded-publication-files/Research-Brief_Opioid-Epidemic-Economic-Burden.pdf. Published November 16, 2017. Accessed February 27, 2019.

**I.      Defendants' Conduct Created an Abatable Public Nuisance**

442.      The opioid crisis is a public nuisance created, perpetuated, and maintained by Defendants. The nuisance can be abated and further recurrence of harm and inconvenience can be abated by taking measures such as providing addiction treatment to patients who are already addicted to opioids, making naloxone widely available so that overdoses are less frequently fatal, and a number of other proven measures to address the epidemic.

## VI.      CLAIMS FOR RELIEF

### FIRST CLAIM
### (Public Nuisance)

443.      Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

444.      Defendants' conduct has unreasonably interfered with a right common to the general public, including Plaintiffs' residents.

445.      The residents of Plaintiffs' communities have a common right to be free from conduct that constitutes an unreasonable interference with the public health, the public safety, the public peace, the public comfort, or the public convenience.

446.      Defendants, directly and acting through their employees and agents, and in concert with each other, have engaged in conduct in the distribution and dispensing of opioids which created a public nuisance that constitutes a significant, unreasonable interference with the common rights of the public.

447.      Defendants' interference with the rights of the public is continuing in nature, and has produced a long-lasting effect, and Defendants knew, or had reason to know, the devastating effects their conduct would have upon Plaintiffs and their residents.

448.    Defendants' conduct is not insubstantial or fleeting. Indeed, Defendants' unlawful conduct has so severely damaged the public health on every geographic and demographic level that the public nuisance perpetrated by Defendants' conduct is commonly referred to as a "crisis" or an "epidemic."

449.    Through their distribution and dispensing of opioids for profit and for use by Plaintiffs' employees and residents, Defendants have created a condition of danger that is ongoing and is causing permanent and long-lasting damage. Indeed, Defendants' conduct has caused deaths, serious injuries, and a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience.

450.    Defendants' conduct has directly and proximately caused injury to Plaintiffs and their residents. By reason of the foregoing, Plaintiffs have been injured and continue to be injured in that they have paid and continue to pay for long-term opioid treatment relating to opioids manufactured or distributed by Defendants or by other drug makers. Plaintiffs have suffered additional damages and continue to suffer damage for the additional costs relating to providing and using opioids long-term to treat chronic pain, either through payment of the prescriptions or payment of premiums.

451.    The ongoing condition of danger and the continuing harm that is being inflicted upon Plaintiffs and their residents is caused by Defendants' intentional conduct.

452.    Defendants' conduct constitutes an absolute public nuisance.

453.    The nuisance created by Defendants is abatable.

454.    By reason of the foregoing, Defendants are responsible to provide for abatement of the nuisance.

124

## SECOND CLAIM
### (Negligence)

455.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

456.    Defendants have a duty to exercise reasonable care in distributing and dispensing opioid drugs.

457.    Each Defendant breached its duty of care.

458.    As a proximate result of the Defendants' breaches of their duties of care, Plaintiffs have suffered economic loss.

459.    Defendant's negligence created a health or safety hazard, including a serious risk of death or personal injury, the correction of which resulted in economic loss to Plaintiffs.

460.    The harm suffered by Plaintiffs was foreseeable.

461.    Defendants should reasonably have expected to be held accountable for the cost of dealing with the health and safety issues caused by their negligent conduct.

462.    The Defendants' conduct was willful, wanton, and malicious, and was directed at the public generally.

463.    By reason of the foregoing, Defendants are liable to compensate Plaintiffs for the damages Plaintiffs have suffered as a result of the opioid epidemic.

## VII.    PRAYER FOR RELIEF

464.    WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, awarding Plaintiffs:

a.  Abatement of the public nuisance;

b.  Compensatory damages in an amount sufficient to fairly and completely compensate Plaintiffs for their injuries;

c.  Punitive damages;

125

d.   Interest, costs, and disbursements; and

e.   Such other and further relief as this Court deems just and proper

## **JURY DEMAND**

The Counties demand trial by jury on all questions so triable.

Dated: September 20, 2022

James E. Hartley, Jr.
Devin Hartley
Charles Hellman
DRUBNER, HARTLEY, MENGACCI & HELLMAN, LLC
500 Chase Parkway
Waterbury, CT 06708
(203) 753-9291
jhart@dhhllc.com
chellman@dhhllc.com
dhartley@dhhllc.com

Jayne Conroy
Thomas I. Sheridan, III
Andrea Bierstein
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016
(212) 784-6402
jconroy@simmonsfirm.com

Sarah S. Burns
SIMMONS HANLY CONROY LLC
One Court Street
Alton, IL 62002
(618) 259-2222
sburns@simmonsfirm.com

David Slossberg
HURWITZ, SAGARIN, SLOSSBERG & KNUFF, LLC
147 North Broad Street
Milford, CT 06460
(203) 877-8000
dslossberg@hssklaw.com

*Attorneys for Plaintiffs*

126